THE COUNTY OF DE WITT, Plaintiff-Appellee, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, Defendant-Appellant.

Fourth District   No. 4—98—0104

Opinion filed August 11, 1998.

Gilbert Feldman (argued), of Cornfield & Feldman, of Chicago, for appellant.

Nick A. Cetwinski (argued), of Clarendon Hills, for appellee.

JUSTICE COOK delivered the opinion of the court:

In September 1995, plaintiff De Witt County terminated Susan

Winstead, a certified nurse's aide (CNA), from her employment at the De Witt County Nursing Home (Home). She was terminated for allegedly striking Esther Tatham, a senior citizen resident, in the head. Winstead was a union member of defendant American Federation of State, County and Municipal Employees, Council 31 (AFSCME). According to the collective-bargaining agreement (Agreement) between AFSCME and the County, an employee could only be disciplined for "just cause." The Agreement also provides that "employees shall be immediately subject to discharge for resident abuse."

Pursuant to the Agreement, plaintiff and defendant submitted to arbitration the issue of whether the County had "just cause" to terminate Winstead and, if not, what was the proper remedy. Evidentiary hearings were held before the arbitrator in January and February 1997.

Julie Ann Zook testified she was an intern in the Bogard Specialized Service Program (Program) of the De Witt County Resource Center and was at the Home tending to her clients on the date of the incident. She had just entered the cafeteria and was speaking with Donna Kivlehan, another employee of the Program, when she witnessed the incident. Zook looked over and heard a male nurse yell something like "[y]ou need to get that out of her hand." The nurse was speaking to Winstead and referring to Tatham, who had just grabbed a glass of milk from a resident sitting next to her at the table. Zook testified that Winstead grabbed the glass from Tatham's hand, hit her on the side of her head, and slammed the glass down in front of the other resident. The hit caused Tatham's head to move a little bit, but Zook did not think the hit was hard enough to leave a mark. Zook claimed that Tatham seemed to shrug it off "like it happened to her all of the time" and "she didn't think it was any big deal to be hit."

Kivlehan testified she was a rehabilitation technician for the De Witt County Resource Center and was tending to one of her clients in the cafeteria when she witnessed the incident. She heard a male nurse ask Winstead to "get the milk from Esther." Then she saw Winstead walk over and backhand Tatham on the side of the head and take the milk from her. Kivlehan testified she was very disturbed by Tatham's response to the hit. She claimed that Tatham "just did nothing, and almost as though that was part of the program here, and it was O.K. that it happened to her."

At the time of the incident, Winstead had worked at the Home for 10 years and had a flawless employment record. Winstead testified that at the time of the incident she was feeding another resident in the cafeteria. She could not remember anything out of the ordinary

happening that day. Winstead denied that she hit Tatham and testified she had no recollection of going over to Tatham's table.

Karen Mandrell testified she was employed at the nursing home and was working during the lunch period on the date of the incident. She did not hear any loud voices or other incidents out of the ordinary. Mandrell claimed she would have seen such an incident had it occurred. Mandrell admitted that Winstead was a good friend, but that she would still report her if she had struck a resident.

Jean Crispen, a certified nurse assistant, testified she was in the cafeteria that day feeding a resident and did not see anyone hit Tatham. Crispen claimed she would have seen such an incident if it had occurred. Crispen also admitted that Winstead was her personal friend, but she would not lie to protect her. During the investigation of the incident, the police asked Crispen to take a polygraph test. Crispen refused to take the test, claiming that she knew she was telling the truth and she did not need to prove anything.

Sergeant Dale Marlo, a State Police officer, conducted the investigation of the incident. He testified he interviewed nine different employees of the Home, and none of them were aware of Tatham being struck by anyone at the Home. He also interviewed Winstead, who denied that she or any other employee had struck Tatham. Marlo asked Winstead to submit to a polygraph test, but she refused to take it.

Nick Cetwinski, the Home's attorney, testified he spoke with Sergeant Marlo after the incident and asked him whether, in his opinion, the striking had happened. Marlo advised Cetwinski that, in his opinion, the striking had occurred because the Resource Center employees had no reason to fabricate the incident and he felt the employees of the Home felt intimidated by Winstead into not cooperating with him. Based on Marlo's opinion and his own opinion, Cetwinski believed the striking had occurred and he felt the Home had no choice but to terminate Winstead.

The arbitrator found Winstead may have struck Tatham; however, even if she did, Tatham was not injured and it was "just as reasonable to conclude that Grievant just brushed the side of Tatham's head." The arbitrator also determined it was unlikely that Winstead would ever strike a resident again, based on her long service and exemplary record. The arbitrator recognized that the Agreement called for immediate discharge for those employees who commit resident abuse; however, the arbitrator determined that one incident, which did not result in injury, was not "abuse." The arbitrator ruled there was no just cause for Winstead's termination and ordered her to be reinstated to her former position and awarded all lost pay and seniority.

In July 1997, the County brought an action to vacate the arbitration award on the grounds that it violated the State of Illinois public policy of protecting the elderly. In January 1998, the trial court granted the motion to vacate. AFSCME appeals from that order, arguing that we should reverse the trial court and reinstate the arbitrator's award and Winstead to her employment at the Home.

■ The judicial review of an arbitral award is extremely limited, which reflects the legislature's intent in providing finality for labor disputes submitted to arbitration. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 304, 671 N.E.2d 668, 672 (1996) (DuBose, grievant) (hereinafter *CMS*). A court may not reverse an arbitrator's decision simply because it is contrary to the manifest weight of the evidence. See 710 ILCS 5/12, 13 (West 1996). Any question regarding the interpretation of a collective-bargaining agreement is to be answered by the arbitrator, and we will not overrule that construction merely because our interpretation differs from that of the arbitrator. *CMS*, 173 Ill. 2d at 305, 671 N.E.2d at 672. In this case, the arbitrator decided that the striking, even if it occurred, did not reach the level of just cause for termination. The arbitrator's decision was based on his interpretation of the Agreement and we will not reverse the award on those grounds.

However, even if the arbitrator's award was properly based on his interpretation of the Agreement, we will vacate the award if it is repugnant to established norms of public policy. To vacate an arbitral award upon these grounds, the contract, as interpreted by the arbitrator, must violate some explicit public policy. *American Federation of State, County & Municipal Employees v. State of Illinois*, 124 Ill. 2d 246, 261, 529 N.E.2d 534, 540 (1988) (Howe Developmental Center grievance). The application of the public policy requires a two-step analysis. First, we must determine whether a well-defined and dominant public policy can be identified. If so, we must then determine whether the arbitrator's award, as reflected in his interpretation of the Agreement, violated the public policy. To ascertain the existence of public policy, we will look to our constitution, statutes, and relevant judicial opinions. *CMS*, 173 Ill. 2d at 307, 671 N.E.2d at 674.

■ An established public policy exists in Illinois to protect the elderly from abuse or harm. The Nursing Home Care Act (210 ILCS 45/1—101 *et seq.* (West 1996)) and the Elder Abuse and Neglect Act (320 ILCS 20/1 *et seq.* (West 1996)) are clear examples of the legislature's intent to protect the elderly from neglect, abuse, and degrading treatment in nursing homes and domestic situations. *Alden Nursing Center—Morrow, Inc. v. Lumpkin*, 259 Ill. App. 3d 1027, 1033,

632 N.E.2d 66, 70 (1994). Further evidence of the public policy of protecting senior citizens can be found in criminal statutes that increase the classification and punishment for those crimes committed against victims over the age of 60. See 720 ILCS 5/12—4.6 (West 1996) (the offense of battery is upgraded to an aggravated battery when defendant knowingly causes bodily harm to an individual of 60 years of age or older).

■ The arbitrator interpreted the Agreement to hold that one incident of striking, that causes no apparent injury, does not amount to "resident abuse" and the employee may not be terminated for that singular offense. Essentially, the arbitrator's interpretation creates a "one free hit" rule, where employees may strike a resident without fear of termination, so long as it is an isolated incident that does not produce a physical injury. We conclude such an interpretation violates the established public policy of protecting senior citizens from abusive and degrading treatment. When a nursing home employee lashes out in frustration or anger and strikes a resident, it is small comfort that it happened only once or that the hit did not create a visible injury. Such an incident is degrading and an example of the type of behavior the legislature addressed when it enacted the Nursing Home Care Act and the Elder Abuse and Neglect Act. We believe the public policy of this state does not tolerate *any* incidents of abuse upon the elderly, no matter how infrequent or mild. Therefore, we cannot recognize or enforce an interpretation of a contract that prevents an employer from responding to such behavior.

AFSCME argues that the award of reinstatement does not violate public policy because the arbitrator determined Winstead was unlikely to repeat the incident of abuse in the future. AFSCME argues that as long as the arbitrator makes a rational finding that the employee can be trusted to refrain from the offending conduct, the arbitrator may reinstate the employee to his or her former job, and we would be obliged to affirm the award. *CMS*, 173 Ill. 2d at 322, 671 N.E.2d at 680; see also *American Federation of State, County & Municipal Employees*, 124 Ill. 2d at 263, 529 N.E.2d at 541 (reinstatement upheld because arbitrator found employees were exemplary, punishment had been imposed, and conduct did not threaten patient safety); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, International*, 808 F.2d 76 (D.C. Cir. 1987) (reinstatement of pilot who flew commercial airliner while drunk upheld because reinstatement conditioned upon the pilot's recertification by the Federal Aviation Administration).

Initially, we note that questions of public policy are left to the courts, not the arbitrator. *Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600*,

74 Ill. 2d 412, 424, 386 N.E.2d 47, 52 (1979). The arbitrator's determination that public policy was satisfied by his opinion that Winstead would not commit abuse again was not pertinent to the interpretation of the Agreement and we are not bound to follow it. We are not bound by the arbitrator's consideration of public policy, and "we may not abdicate to him our responsibility to protect the public interest at stake." *Board of Trustees*, 74 Ill. 2d at 424, 386 N.E.2d at 52.

In this case, the arbitrator's determination that Winstead posed no threat for future abuse had no rational basis. In previous cases where an arbitrator found that the employees could be trusted to refrain from future misconduct, the employees did not deny their wrongdoing and were still punished in some way. Here, Winstead has stubbornly denied touching Tatham, even in the face of overwhelming evidence that she did, in fact, strike her. We are also concerned that some of the other Home employees may be covering up for her. Certainly, this is no clear indication that such an incident will not happen again.

Also, the arbitrator awarded complete reinstatement to Winstead, without the slightest reprimand for her behavior. Thus, he did not take any precautionary steps to deter future misconduct or to ensure it will not be repeated. See *CMS*, 173 Ill. 2d at 317, 671 N.E.2d at 678. If anything, the arbitrator's award encourages misconduct because it prevents nursing homes from terminating abusive employees unless it is proved the abuse is repetitive or results in physical injury. The arbitrator's award does not in any way promote the welfare and protection of the elderly and violates public policy.

AFSCME also argues that we are bound by the fact-finding of the arbitrator and must defer to his determination that Winstead was not guilty of the charged misconduct. Generally, a court is bound by the arbitrator's view of the facts. *American Federation of State, County & Municipal Employees*, 124 Ill. 2d at 255, 529 N.E.2d at 538. However, the arbitrator never determined Winstead did not strike Tatham. Conversely, he seems to have determined that Winstead probably did hit Tatham, but just "brushed the side of her head." (Interestingly, this conclusion required the arbitrator to discount *every* witness, none of whom testified the striking was accidental or a "brushing.") None of the arbitrator's findings prevents us from recognizing the overwhelming evidence that the striking occurred and that Winstead's reinstatement violates public policy.

We recognize the importance of arbitration in settling labor disputes and the policy favoring freedom of contract. Ordinarily, we would not be concerned about even the most absurd interpretation of a collective-bargaining agreement or manifestly erroneous fact-finding

by an arbitrator. It is the arbitrator's construction that was bargained for, and the courts have no business overruling him because their interpretation is different from his. *CMS*, 173 Ill. 2d at 329, 671 N.E.2d at 683-84. However, when an arbitrator's award infringes upon the welfare of senior citizens, who are not parties to the contract, the policy favoring arbitration and freedom of contract must yield to the public policy of protecting the elderly. Accordingly, we affirm the trial court's decision to vacate the arbitrator's award.

Affirmed.

GARMAN, P.J., and KNECHT, J., concur.