SIXTH DIVISION

August 11, 2000

No. 1- 99-2647

CHICAGO FIRE FIGHTERS UNION LOCAL NO 2, ) APPEAL FROM THE

 ) CIRCUIT COURT

Plaintiff-Appellee, ) OF COOK COUNTY.

)

v. )

)

CITY OF CHICAGO, ) HONORABLE

) THOMAS A. HETT,

Defendant-Appellant. ) JUDGE PRESIDING.

JUSTICE CAMPBELL delivered the opinion of the court: 

This appeal arises out of the discharge or suspension of 28 employees of the Chicago Fire Department (CFD), by respondent, the City of Chicago, (the City), as a result of their participa­tion in an unauthorized retirement party at a Chicago firehouse.  Petitioners, the Chicago Fire Fighters Union Local No. 2 (the Union) grieved the disci­

pline, and an arbitrator held the discharges and disciplinary suspensions untimely, thereby reinstating the employees to their respec­tive positions and vacating the disci­plinary actions.  The Union then initiated an action to enforce an arbitration award issued pur­

suant to Section 11 of the Uniform Arbitration Act.  710 ILCS 5/11 (West 1998).  The City filed a counter petition to vacate the arbitration award.  After considering cross motions for summary judgment, the circuit court of Cook County entered an order grant­ing the Union's motion and denying that of the City.  On appeal, the City contends that the arbitration award should be vacated as against public policy.  For the following reasons, we vacate the order entered below, and reverse and remand this matter for further proceedings consistent with this opinion.

BACKGROUND

The following facts are relevant to this appeal.  In May 1997, CFD Internal Affairs Division ("IAD") Executive Assistant Mark Edingburg learned of the existence of a video­tape of an unauthorized retirement party held on April 12, 1990, at the CFD firehouse known as Engine 100.  The videotape depicted firefighters drinking alcoholic beverages inside the firehouse; leaving the firehouse in fire trucks to respond to fire calls; some participants making offensive racial, gender and ethnic slurs; and some engaging in other conduct such as exposing their bare buttocks and genitals.  Edinburg viewed the videotape on May 9, 1997.  On May 13, 1997, Edinburg advised Edward F. Altman, the IAD Director, of the existence of the videotape 
via
 memorandum.  Altman did not notify his superiors of the existence of the videotape until late November 1997, after Altman learned that a local television news reporter had obtained a copy of the videotape.  At that time, the CFD and the City commenced the disciplinary investigation process.

In early December 1997, the City filed charges against the 28 employees who participated in the videotaped party.  Following an investigation conducted by Inspector General Alexander Vroustouris, discipline was imposed on the employees in May 1998.  The disciplinary actions consisted of the discharge of seven employees and suspensions ranging form 6 to 60 days for the remaining employees.

On February 10, 1998, Altman was also charged with misconduct for failing to open an investigation after learning of the videotape and failing to apprize his superiors of the existence of the videotape.  By letter dated February 25, 1998, Altman was separated from his position as Director of IAD.

 Pursuant to the collective bargaining agreement (Agreement) between the City and the Union, the Union filed grievances on behalf of the 28 disciplined CFD employ­

ees.  An arbitration hearing commenced before Arbitrator Edwin H. Benn on October 2, 1998.  The arbitration proceedings were limited to the threshold question as follows:

"Whether the investigation of the alleged April 12, 1990 incident at Engine 100's quarters and/or the discipline imposed regarding such incident was or were untimely, that the discipline cannot stand?  If so, what is the appropriate remedy?"

The text of the opinion and award includes Benn's comment in a footnote that:

"The videotape was received in evidence over the Union's objection.  By receipt to the tape in evidence, I do not find at this time that the named Grievants engaged in the conduct or to the degree attributed to them by the charges in this case.  The videotape was received for the limited purpose of show­ing that it was the basis used by the City to impose disci­

pline." 

Arbitrator Benn issued his opinion and award on December 30, 1998, finding that the disciplinary action was invalid as untimely, pursuant to Section 16.2(E) of the Agreement.  Section 16.2(E) provides in pertinent part as follows:

"The Employer shall conduct disciplinary investigations when it receives complaints or has reason to believe an employee has failed to fulfill his responsibilities as an employee and just cause for discipline exists." 

Benn found that pursuant to section 16.2(E), the City was required to have begun a disciplinary investigation "at the time" it learned of the alleged misconduct, and that a six-and-one-half month delay in the commencement of the disciplinary investigative process "was far beyond any reasonable time period allowed."

Next, as stipulated by the parties, Benn determined the appropriate remedy pursuant to section 16.2C of the Agreement which provides that:

"Any employee found to be unjustly suspended or discharged shall be reinstated with full compensation for all lost time and with full restoration of all other right, benefits and conditions of employment, without prejudice, unless a lesser remedy is agreed upon as a grievance settlement or deemed appropriate by an arbitrator."

Benn concluded that the disciplinary actions shall be rescinded: 

"[t]hose employees discharged shall be reinstated to their former positions without loss of seniority rights, benefits and conditions of employment, without prejudice.  All affected employees shall have their records cleared of references to discipline stemming from the April, 1990 party.  All affected employees shall be made whole for lost wages and benefits and in all other respects."

After setting forth the award, Benn noted that he was required by 
American Federation of State County and Municipal Employees v. Department of Central Management Services
, 173 Ill. 2d 299, 671 N.E. 2d 668 (1996), to take precautionary steps to ensure the misconduct at issue would not be repeated and to take into consideration pertinent public policy concerns.  Benn stated:

"As I view the evidence before me, I am satisfied, and I find, that the public can be assured that the alleged misconduct will not be repeated by Grievants and that steps have been or can be taken to ensure that result.

Taken at its worst, the alleged misconduct in this case shows that eight years before they were disciplined, Grievants, in varying degrees, consumed alcohol in a firehouse against regulations (and with the implication that the citizens of the community served by Engine 100 did not have at their disposal the services of a full complement of unencumbered firefighters); some made racial, gender and ethnic offensive comments; and some engaged in boorish exhibitionist conduct.  Those are troubling and serious allegations and the implications of that conduct have a profound impact on the citizens of the City.  However, I am satisfied that the alleged misconduct will not happen again from these Grievants.

First, I must consider the nature of the involved employees.  For the most part, Grievants are 
very long
 term employees, some having over 25 years of service with the City.  Since the incident, a number of Grievants have been promoted to Engineer, Lieutenant, Captain, or Battalion Chief indicating their competence and capabilities as members of the Department.  Since the incident, a number of Grievants have received commendations for their service and have saved lives and protected property of the citizens of Chicago.  The parties agreed that there has been no pertinent discipline for Grievants prior to April 12, 1990 (with the exception of an oral reprimand). [citation omitted] With the exception of the alleged misconduct which occurred on one day some eight years before they were actually disciplined, Grievants' records show them to be exceptional employees and they have not engaged in similar misconduct (or for that matter, for all purposes, any misconduct) during that lengthy period of time.

Second, I also have to consider the nature of Grievants' work.  They are firefighters.  As such, Grievants routinely risk their lives to save the lives and protect the property of others.  They have been trained at considerable public expense and have amassed considerable experience at performing their craft.  Particularly with respect to those discharged, the public loses when those long term and experienced employees are no longer permitted to use their training and experience for the safety and protection of the citizens of the City.

Third, the fact that the City moved to take very strong disciplinary action against Grievants is a clear and unambig­

uous statement to Grievants that they will be disciplined to the fullest extent should they engage in such conduct in the future.  Given the high quality of employees involved in this case, I am satisfied that message will be heeded.

Fourth, this case has received extensive publicity - locally and nationally - and I suspect that the publicity will probably now continue.  Given the nature of some of the misconduct involved in this dispute, to be part of that kind of publicity must be a damning public embarrassment to these Grievants.  Again, the strong message has been sent to Grievants of the consequences of this type of conduct and the need that it never again be repeated.

Fifth, the City has already put in place mechanisms to prevent such conduct from occurring in the future.  In Department Memo M-39-37 dated December 8, 1997 which issued as a result of the alleged misconduct in this case, the Fire Commissioner ordered all Department members to re-

familiarize themselves with the orders prohibiting substance abuse and discrimination and sexual harassment; advised the employees that violations of those orders will not be tolerated and that discipline for such violations will be taken; and that management changes were put in place to ensure strict compliance with the Department's Code of Conduct.  If anything is not crystal clear, the Department's stance on the kind of party and conduct which occurred on April 12, 1990 is now known - it will 
not 
be tolerated.

Sixth, with respect to the alleged racial, gender and ethnic offensive comments made by some one [sic] the videotape, if the City is of the opinion that such views still exist within the ranks of Department, it is free within the scope of its managerial prerogatives and the terms of Agreement to train and repeatedly retrain its members as a whole that such conduct has absolutely no place in the workplace.  If that training does not work, the City is free to take strong and swift disciplinary action.  The City has within its control powerful mechanisms to make certain that Grievants do not engage in this kind of conduct in the future.

In sum then, I am satisfied - and I find - that Grievants are capable of rehabilitation; that the conduct allegedly engaged in by Grievants will not reoccur; and that steps have been taken and can be taken to assure the public of that result." (Emphasis in original).

The Union filed a petition to enforce the arbitration award in the circuit court, and the City filed a counter-petition to vacate the arbitration award.  The parties filed cross motions for summary judgment.  In its motion, the City argued that the arbitrator had exceeded his authority and that the award violated public policy.

On June 22, 1999, the circuit court granted the Union's petition to enforce the award and denied the City's counter-petition to vacate the award.  The circuit court found that the City was estopped from raising public policy as a ground for vacating the award because it had agreed to submit the question of timeliness and the issue of the remedy to the arbitrator.  The City filed a timely appeal from the order of the circuit court.

OPINION

This matter calls upon the court to address a serious matter of public policy affecting the health, safety and welfare of the citizens of the city of Chicago.  On appeal, the City contends that the trial court erred in refusing to consider public policy as a ground for vacating the arbitration award entered in favor of the Union.  The City argues that the award violates the public policy favoring a safe and effective fire prevention system. We agree.

I.  Standard of Review

 We acknowledge that judicial review of an arbitral award is extremely limited.  
American Federation of State, County & Municipal Employees v. State of Illinois
, 124 Ill.2d 246, 254, 529 N.E.2d 534 (1988) (hereafter "
AFSCME I
 ");  
Board of Trustees v. Cook County College Teachers Union, Local 1600
, 74 Ill.2d 412, 418, 386 N.E.2d 47 (1979).  This standard reflects the legislature's intent in enacting the Illinois Uniform Arbitration Act, that is, to provide finality for labor disputes submitted to arbitration.  See 710 ILCS 5/12 (West 1994) (denying judicial authority to vacate arbitral awards except on grounds recognized at common law).  The Act contemplates judicial disturbance of an award only in instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration.  
Board of Education v. Chicago Teachers Union, Local No. 1
, 86 Ill.2d 469, 474, 427 N.E.2d 1199 (1981).  Thus, a court of review must enforce a labor-arbitration award if the arbitrator acts within the scope of his or her authority and the award draws its essence from the parties' collective-bargaining agreement.  
American Federation of State, County and Municipal Employees, AFL-CIO v. Department of Central Management Services
, 173 Ill. 2d 299, 305, 671 N.E. 2d 668 (1996) (hereafter "
AFSCME II
")

However, even if the arbitrator makes his award within the scope of his authority and the award is based on the arbitrator's interpretation of the agreement, we will vacate the award if it is repugnant to the established norms of public policy.  
AFSCME I
, 124 Ill.2d at 254, 529 N.E.2d 534 (1988); 
County of De Witt v. American Federation of State, County, Mun. Employees, Council 31
, 298 Ill.App.3d 634, 637, 699 N.E.2d 163 (1998).

II.  Waiver

In the present case, the trial court held that the City was "estopped" from raising a public policy defense because the parties stipulated to submit to the arbitrator only the issue of the timeliness of the discipline and the fashioning of the appropriate remedy.  Thus, on appeal, the Union contends that the City "waived" its right to condemn the award as violative of public policy. 

The Union's contention is unsupported by either the record or controlling authority.  Questions of public policy are left to the courts, not the arbitrator.  On review, this court is not bound by the arbitrator's consideration of public policy and we may not abdicate to the arbitrator our responsibility to protect the public interest at stake. 
Board of Trustees
, 74 Ill. 2d at 424, 386 N.E. 2d 47 (1979).  "Questions of public policy * * * are ultimately left for resolution by the courts."  
AFSCME II
, 173 Ill. 2d at 318. 

The authority relied upon by the Union in support of its argument for waiver is distinguishable.  For example, in 
Board of Education v. Illinois Education Labor Rela­

tions Board
, 289  Ill. App. 3d 1019, 682 N.E. 2d 398 (1997), the Board of Education (Board) terminated a teacher for unsatisfactory performance.  The Chicago Teachers Union (CTU) filed a grievance on behalf of the teacher, arguing that the Board violated the collective bargaining agreement by evaluating the teacher's performance according to the incorrect procedures for tenured teachers.  The grievance went to arbitration, and the arbitrator issued a final and binding award in favor of the CTU, ordering reinstatement of the teacher.  The Board, however, failed to both comply with the arbitrator's award, and to file any timely exceptions to the award.  After the deadline for the filing of exceptions passed, the Board filed exceptions to the ALJ's original decision, arguing that the decision was against the public policy of providing a quality public education.  The IELRB issued its opinion holding that the original decision by the ALJ was final and binding. 
Board of Education
, 289  Ill. App. 3d at 838.  

On appeal, this court held that the Board's failure to file timely exceptions to the original decision of the ALJ constituted waiver of its right to contest the propriety of that decision.  This court found the public policy concerns "radically different" from those implicated in 
AFSCME II
 (see discussion 
infra)
 and not controlling of the facts presented in the Board's appeal.  
Board of Education
, 289  Ill. App. 3d at 1022. 

By contrast, in the present case, the issue of public policy was properly before the arbitrator.  The record shows that the arbitrator not only acknowledged the implication of public policy concerns, but went to great lengths in his opinion and order to address those concerns, ultimately concluding that public policy was not adversely affected by his decision to reinstate the 28 firefighters.

An agreement to submit to arbitration does not operate as a device or structure to circumvent questions of public policy, especially where, as here, the Union initiated an action in court to enforce the arbitration award.  We therefore find erroneous the trial court's determination that the City was foreclosed from challenging the award as against public policy upon review in the circuit court.  

 
III.  Public Policy Exception

In order to vacate an award under the "public policy exception" we are required to undertake a two-step analysis.  First, we inquire whether a well-defined and dominant public policy can be identified.  If so, we must then determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy. To ascertain the existence of public policy, we look to our constitution, statutes and relevant judicial opinions.  
AFSCME II
, 173 Ill.2d at 308; 
De Witt
, 298  Ill. App. 3d at 637.

As to the first inquiry, it is unquestionable that an established public policy exists in Illinois favoring safe and effective fire protection services.  The Illinois Legislature specifically created fire protection districts in 1871 (Laws 1871-72, p.218, art. V, (as renumbered) § 64), and codified fire protection districts with the creation of the Fire Protection District Act (The Act) in 1927.  Laws, 1927, p.305 (July 8, 1927), § 1; Ill. Rev. Stat. 1927, ch. 127 ½,  ¶ 31.
(footnote: 1)  The Act pronounces that fire protection districts are fundamentally created "as a matter of legislative determination * * *  in order to promote and protect the health, safety, welfare and convenience of the public," and in the "public interest * * * [to] provide as nearly adequate protection from fire for lives and property within the districts as possible and regulate the prevention and control of fire therein."  70 ILCS 705/1 (West 1998) (formerly Ill. Rev. Stat 1991, ch. 127 ½ ¶ 21). 

Further evidence of the public policy of protecting the public from fire can be found in section 11 of the Act which provides for life saving and rescue equipment, emergency ambulance services and facilities in furtherance of the "declared matter of public policy * * * to preserve, protect and promote the public health, safety and general welfare."  70 ILCS 705/22 (West 1998).
(footnote: 2)  Additional examples of our legislature's intent to promote fire safety is evidenced by other statutes, including the Illinois Fire Protection Training Act (50 ILCS 740/1, 
et. seq. 
(West 1998)), which requires advanced training of fire department protection personnel "in order to promote and protect the health, safety, and welfare of the public * * * ." (50 ILCS 740/1 (West 1998)); as well as the entirety of Chapter 425 of the Illinois Compiled Statutes entitled:  "Fire Safety," which includes Acts requiring smoke detectors in such public facilities as nursing homes, child care facilities, and community residential alternative homes ("Facilities Requiring Smoke Detectors Act," 425 ILCS 10 (West 1998); The Forest Fire Protection District Act (425 ILCS 40 (West 1998), designed for the prevention and suppression of forest fires and which also incorporates criminal penalties for violation thereof; and Acts regulating Fireworks (425 ILCS 30, 35 (West 1998)), Furniture Fire Safety (425 ILCS 45 (West 1998)), Fire Escapes (425 ILCS 15 (West 1998)), and Space Heating (425 ILCS 65 (West 1998)).

Having identified a well-defined public policy favoring safe and effective fire prevention services, we next turn our attention to the question of whether the arbitrator's award violated that public policy. 

Here, the arbitrator interpreted the Agreement to hold that a six-and-one-half month delay in instituting disciplinary action against the 28 firefighters was in contraven­tion of the provision of the agreement which required that the offending firefighter be notified of disciplinary action "when" the department became aware of the alleged infrac­

tion, or specifically, in the words of the arbitrator, "at the time" the department learned of the alleged misconduct.  However, the Agreement contains no explicit provision detailing that investigations of infractions of CFD rules begin within any specific time period.

In 
AFSCME II
, our supreme court refuted a similar interpretation of a timeliness provision in a collective bargaining agreement regarding the institution of a disciplinary action. The facts in that case are as follows: In August 1990, the Department of Children and Family Services (DCFS) learned that a worker had filed a false report about the progress of children in the DCFS system.  In her report, submitted in February 1990, the worker stated that the children were "doing fine," when they had in fact perished in a fire in January 1990.  Investigators completed a written report against the worker on Decem­

ber 13, 1990, however, no further disciplinary action was taken against the worker for 7 ½ months, until June 20, 1991.  The Union, AFSCME, intervened arguing that under the collective bargaining agreement (CBA), disciplinary action could not be taken against the worker in view of the "extreme time delay."  After arbitration, the arbitrator conclud­

ed that the DCFS' failure to impose discipline in a timely fashion according to the CBA prevented him from reaching the merits of the dispute. The CBA provided in pertinent part:

"Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter.  In any event, the actual date upon which discipline commences may not exceed forty five (45) days after the completion of the predisciplinary meeting."

The arbitrator ordered the worker reinstated.

The State appealed, and the circuit court held that reinstatement violated public policy and remanded the matter to the arbitrator for a decision on the merits.  The arbitrator refused to hear the merits of the case, however, after AFSCME "demurred," electing to stand on the arbitrator's initial decision.  AFSCME filed a petition in the circuit court, seeking to confirm the arbitrator's initial award, which was denied by the circuit court.  On appeal, the appellate court reversed, holding that the time provisions contained in the CBA could not be relaxed in favor of public policy.  
AFSCME II
, 173 Ill. 2d at 303 (citing 272  Ill. App. 3d 814, 818, 651 N.E. 2d 718).

Our supreme court reversed.  In determining that reinstatement of the worker violated  public policy in that it totally ignored any of the legitimate public policy concerns charging a state agency and its employees "with particular responsibilities which represent the will of the public with respect to the welfare and protection of children." the court held:

"In certain cases, interpreting the time provisions as the arbitrator did in this case and ordering reinstatement will not contravene the public policy enunciated above.  * * * However, the manner in which the time provision was enforced in this case with respect to the misconduct at issue cannot be upheld.  As with any limitation, the nature of the conduct at issue must be considered before arbitrary time restrictions can be imposed."  
AFSCME II
, 173 Ill. 2d at 317.

Here, as in 
AFSCME II
, the Union argues that the award of reinstatement of the 28 firefighters does not violate public policy.  The Union argues that the arbitrator strictly followed the guidelines set forth in 
AFSCME II
 for reinstatement through his six-part "rehabilitation" analysis, at the end of which he concluded that the firefighters were unlikely to repeat their offensive conduct in the future. 

However, the City found enough reason, after considering the activities of the individuals on the videotape, to discharge 7 employees and suspend 21 employees.  The City also found it appropriate to "separate" Altman from his position as Director of the IAD. 

Here, public policy considerations regarding the health, safety and welfare of the public regarding its fire prevention services mitigates against
 inappropriate
 remedies for violation of CFD rules:

"As long as the arbitrator's remedy is 'rationally explainable as a logical means of furthering the aims of the contract' [citation], the arbitrator may for example, impose monetary penalties, order the [employer] to reimburse the employee for rehabilitation programs, 
order reinstatement of the employee to a position in which he poses no danger to the public
, or create its own unique sanction to deter overreaching by the employer." 
AFSCME II
, 173 Ill. 2d at 322 (citing 
Union Pacific R.R. Co. v. United Transportation Union
, F. 3d 255, 263 (8
th
 Cir. 1993).) (Emphasis supplied).

In 
Dewitt,
(footnote: 3) this court examined an arbitration award which reinstated a County nursing home employee who had been discharged for striking an elderly resident.  The arbitrator in that case had interpreted the relevant collective bargaining agreement to hold that one incident of striking, which resulted in "no apparent injury" did not amount to "resident abuse" and that the employee could not be terminated for that singular offense.  This court reversed the arbitrator's holding that the arbitrator's "one free hit" rule violated the established public policy of protecting senior citizens from abusive and degrading treatment:

"When a nursing home employee lashes out in frustration or anger and strikes a resident, it is small comfort that it happen­

ed only once or that the hit did not create a visible injury.  Such an incident is degrading and an example of the type of behavior the legislature addressed when it enacted the Nurs­ing Home Care Act and the Elder Abuse and Neglect Act.  We believe the public policy of this state does not tolerate 
any
 incidents of abuse upon the elderly, no matter now infrequent or mild.  Therefore, we cannot recognize or enforce an inter­

pretation of a contract that prevents an employer from re­

spond­ing to such behavior."  
DeWitt
, 298  Ill. App. 3d at 638.

The record shows that the arbitrator cited six reasons why he was assured that employees posed no further danger to the public 
without ever considering the merits of the case.
  Although the order recited that the arbitrator viewed the videotape, the arbitra­

tor specifically stated that it was for the "limited purpose of showing that it was the basis used by the City to impose discipline."  Without considering the conduct contained in the videotape for evidentiary purposes, the arbitrator was unable to fashion an appropriate award.  Failure to consider the merits of the allegations ignores the seriousness of the any possible lack of readiness of municipal firefighters who are on call 24-hours a day to respond to emergency situations within a few scant minutes.  It cannot be doubted that firefighters who are ill-equipped to adequately perform their ascribed duties as the result of a state of intoxication including, but not limited to the operation of any kind of vehicle, may have a substantial, detrimental impact on the health and safety of  the citizens of the City of Chicago.

The record, in fact, belies the arbitrator's conclusions.  Transcripts of interviews of the  firefighters conducted by the City's Inspector General reveal that some of the fire­fight­ers deny any wrongdoing by their conduct. Several firefighters interviewed denied any knowledge of CFD rules and regulations, 
e.g.
, General Order No. 87-008, dated February 1, 1987, that prohibited firefighters from consuming alcohol while on duty.  One lieutenant on duty at Engine 100 on the day of the party acknowledged that there was a "keg" in the firehouse, and although he claimed to have no knowledge of the contents of the keg, he made a statement to another firefighter that "we have to get rid of it," and that he "wanted it out of the firehouse."  At the same time, this lieutenant testified that he neither observed any infractions of CFD rules, nor did he report any misconduct on the part of any fire department employees.  A lieutenant from another company who attended the party with his crew testified that in his opinion, the party did not violate any CFD rules and regulations "according to what's been tradition on our job for a good many years."

 Nevertheless, the arbitrator ordered complete reinstatement of employment and benefits to each individual disciplined by the department.  The order of the arbitrator fails to show that any precautionary steps were taken to deter any future misconduct or to ensure that it would not be repeated.  The arbitrator merely concluded, based on his own assumptions, that the firefighters would fail to engage in any offensive activities in the future.  The arbitrator held no hearing whatsoever on the merits of the alleged infractions committed by the 28 firefighters, and failed to consider any evidence that the firefighters took responsibility in any way for the conduct they engaged in and the charges leveled against them.  The arbitrator's award fails to promote the safety and welfare of the public in direct contravention of well-established public policy. We cannot say that the arbitrator was either within his authority in making a determination of timeliness based on the Agreement or that he was able to make a "rational" finding that the employees could be trusted to refrain from the offending conduct in the future: 

"[W]hen public policy is at issue, it is the court's responsi­

bility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers."  
AFSCME II
, 173 Ill., 2d 333.

Under the circumstances of this case, the petition for relief granted by the arbitrator in favor of the Union and, upheld on review in the circuit court, is hereby vacated, and we remand this matter for a hearing on the merits of the allegations in accordance with the provisions of the collective bargaining agreement.

Vacated, reversed, and remanded with instructions.

BUCKLEY, J., concurring.

ZWICK, P.J., specially concurring.

FOOTNOTES
1:
"The maintenance of fire departments is the exercise of the police power delegated by the state for the benefit of the public generally * * * for the safety health, and general welfare of the public." 
City of Chicago v. Commercial Union Fire Ins. Co.
, 322 Ill. 326, 153 N.E. 488 (1926).

2:
In furtherance of the public policy favoring safe and effective ambulance and emergency medical services, the legislature also enacted the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/1, 
et seq
.(West 1998), which 
inter alia
 sets forth three levels of EMS and the corresponding training and skill levels required to be met by EMS technicians and paramedics.  See, 
e.g.
, 
City of Belvidere v. Illinois State Labor Relations Bd.
, 181 Ill. 2d 191, 692 N.E. 2d 295 (1998).  

3:
We find 
DeWitt
 pertinent to the disposition of this appeal, despite the fact that it was cited in a mere footnote in the Union's brief and only touched upon briefly by the City in its reply brief.