EQUITY INSURANCE MANAGERS OF ILLINOIS, LLC, Plaintiff-Appellee, v. MARY KAY McNICHOLS, Defendant-Appellant.

First District (4th Division)   No. 1—99—2950

Opinion filed August 2, 2001.

Richter, Jaros & Robinson, of Oak Brook (Arthur G. Jaros, Jr., of counsel), for appellant.

Kamensky & Rubinstein, of Lincolnwood (Stuart Gimbel and Ron Brand, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Equity Insurance Managers of Illinois (Equity), obtained a $91,000 arbitration award against defendant, Mary Kay McNichols, following defendant's breach of an employment contract. The circuit court confirmed the award and defendant appeals, alleging (1) the court erred in not vacating the award because the employment contract violated public policy and (2) the amount of the award was miscalculated.

In March 1985, McNichols began her employment at Irland & Rogers, Inc. (Irland), an insurance wholesaler. In 1996, Charley Rogers, the president and principal shareholder of Irland, sold Irland's

book of business and name to Equity. During the sale negotiations, Rogers requested that several Irland employees, including McNichols, be provided with employment contracts to protect their employment after the sale.

About December 10, 1996, James Skelton, Sr. (Skelton Sr.), the managing director of Equity, presented McNichols with an employment contract. McNichols returned the employment contract to Skelton Sr. unsigned, because she objected to a noncompete clause in the contract and the amount of salary. Shortly thereafter, a second employment contract was tendered. McNichols again refused to sign the contract because it still contained a noncompete clause. On December 30, 1996, Skelton Sr. provided McNichols with a final draft of the contract. McNichols testified that Skelton Sr. told her she needed to sign the contract in order to complete the sale the following day. McNichols reviewed the contract, identified a typographical error in the salary, and questioned a noncompete clause. Skelton Sr. informed her the noncompete clause did not allow her to compete with Equity while employed by Equity.

The corrected contract included a salary of $68,500, a bonus based on 2% of Equity's profit, a clause stating McNichols agreed to remain an employee of Equity from January 1, 1997, through December 31, 1999, and a clause stating any dispute with respect to the construction or interpretation of the contract which could not be settled by the parties would be decided by a single arbitrator. Equity retained the right to terminate McNichols' employment "for cause." The contract did not include any language allowing McNichols to leave Equity before December 31, 1999. McNichols testified that during the final negotiations, she indicated to Skelton Sr. that she understood she could leave for any reason or be fired for any reason and Skelton Sr. responded, "that's right." Skelton Sr. testified he did not recall responding to McNichols' comment during their discussion in light of the language of the contract. McNichols signed the contract on either December 30 or December 31, 1996. McNichols admits she read the contract but did not spend a great deal of time addressing it and did not consult an attorney because December is a very busy time of the year.

Following the acquisition, Equity began marketing itself both as an insurance wholesale broker and as a managing general agent. Skelton Sr. and James Skelton, Jr. (Skelton Jr.), the assistant managing director, did not have substantial wholesale broker or underwriting experience. McNichols spent a good deal of time providing training to both Skeltons. During the first year, Equity financed marketing efforts to increase business, but did not make a profit in 1997 due to ineffective marketing efforts and the accrual of extraordinary expenses

including the installation of a new computer system and a copy machine.

McNichols became disenchanted with Equity for several reasons, including: the work day hours changed from 8:30 a.m. to 4:30 p.m. to 8:30 a.m. to 5 p.m.; she was required to attend a weekly morning meeting that necessitated leaving her home early in the morning; she took work home with her; she worked several Sundays; she endured a long commute from her home; she did not receive additional staff to assist her as promised; she believed Equity was illegally charging customers an assembly fee; she perceived individuals at Equity Kentucky, a major shareholder of Equity, as sexist; she could not communicate with Equity Kentucky employees directly; she believed she did not receive some of the perks enjoyed by the Skeltons, such as trips to conventions with spouses; and she believed Equity had financial problems.

In January 1998, William Yurek of AVRECO, Inc. (AVRECO), a direct competitor of Equity, contacted McNichols about possible employment with AVRECO. McNichols and Yurek met for lunch and discussed the possibility of her employment with AVRECO. A few days later, McNichols met with Yurek at AVRECO's offices, presented her salary requirements, toured the offices, and reviewed AVRECO's client list. Later that day, Yurek telephoned McNichols and offered her a position, including a salary of $85,000 per year, profit sharing, and additional vacation time and holidays.

The next morning, McNichols informed Skelton Sr. about AVRECO's offer. McNichols was hurt that he did not make a counter offer or attempt to convince her to stay. McNichols continued working for Equity for two weeks, during which time she continued to perform her normal work, prepared her work for the transition to other employees at Equity, and cleaned out her office. On her last day, Skelton Sr. asked McNichols to sign a termination agreement. McNichols refused, testifying she believed that the terms of the agreement differed from her understanding that she could leave Equity at any time and there would not be a noncompete clause. McNichols testified she resigned from Equity because "a better offer had come along, and it seemed *** ideal. I was overworked [and] considerably underpaid." She agreed she resigned for a better opportunity.

In May 1998, Equity hired David Russow at a salary of $55,000 per year with no benefits to replace McNichols. Russow had about 20 years of insurance experience, but limited underwriting and brokerage experience. Russow needed a substantial amount of time to understand Equity's business and meet its clients. He generated substantially less business than did McNichols. Equity's business declined and Skelton

Sr., Skelton Jr., and another Equity employee spent about 10% of their time attempting to renew business previously serviced by McNichols.

In May 1998, Equity initiated arbitration proceedings against McNichols, alleging she breached her employment contract by leaving before December 31, 1999, and breached the noncompete clause. An arbitrator heard extensive testimony concerning Equity's claims and, in December 1998, found McNichols did not breach the noncompete clause of the contract because the clause was only in effect while she was employed by Equity; but did breach the contract by "accepting a better opportunity with AVRECO" before the contract's expiration; and found no record evidence of intolerable working conditions that would rise to the level of a constructive discharge. The arbitrator assessed Equity's damages at $91,000 based on the cost of replacing McNichols, foreseeable consequential damages, and Equity's duty to mitigate damages. The arbitrator found that Equity saved approximately $17,000 in salary payments because McNichols was not replaced for three months and approximately $29,000 in salary and benefits from the date Russow was hired because of the difference in McNichols' and Russow's salary, for a total savings of $46,000 in personnel costs. The arbitrator offset the amount saved by $28,000 to account for the 10% of time the Skeltons and another employee had to spend administering and reviewing McNichols' accounts, assuming the disruption was over by the end of 1998. Therefore, Equity saved approximately $18,000 in personnel costs through December 31, 1999.

The arbitrator also found that a loss in new business and renewal commissions was foreseeable based on both parties testifying that personal relationships are very important in the wholesale broker business. The arbitrator found McNichols' stream of new and renewal business commissions could be projected with a reasonable degree of certainty based upon her prior production. Based on McNichols' past production, the arbitrator determined she would have generated approximately $150,000 in commissions for the remainder of 1998 and $170,000 in 1999. The arbitrator then adjusted the amounts because of Equity's duty to find a suitable replacement for McNichols and to otherwise exercise reasonable diligence to minimize its losses. Based on the testimony and exhibits, the arbitrator found Equity's actual loss of commission in 1998 was $75,000 (50% of McNichols' calculated commissions) and $34,000 for 1999 (20% of McNichols' calculated commissions), for a total of $109,000. Subtracting the $18,000 saved in personnel costs, the arbitrator awarded Equity $91,000 plus costs.

In February 1999, Equity moved to confirm the arbitrator's award. The next day, McNichols filed a petition to vacate the award and a multicount complaint at law against Equity. The circuit court

consolidated the two actions. In April 1999, the court granted Equity's petition to confirm the award, denied McNichols' petition to modify or vacate the award, and transferred her complaint to the law division. In May 1999, McNichols unsuccessfully moved for reconsideration of the court's order. Subsequently, McNichols filed a voluntary petition in bankruptcy and this appeal.[1]

## I

●1 McNichols initially asserts that the circuit court should have vacated the arbitration award because it violates the public policy of protecting employees from "unchecked employer power."[2]

Judicial review of an arbitration award is more limited than the review of a trial court's decision. *Klatz v. Western States Insurance Co.*, 298 Ill. App. 3d 815, 701 N.E.2d 1135 (1998) (*Klatz*). Whenever possible, a court must construe an arbitration award so as to uphold its validity and all reasonable presumptions are to be indulged in favor of the award. *Klatz*, 298 Ill. App. 3d at 818. An award may be set aside if it violates some explicit public policy. Illinois public policy is found in its constitution, statutes, and judicial decisions. *County of De Witt v. American Federation of State, County & Municipal Employees, Council 31*, 298 Ill. App. 3d 634, 699 N.E.2d 163 (1998) (*County of De Witt*).

In the instant case, McNichols contends that the employment contract violated public policy disfavoring "unchecked employer power." She argues that Equity's ability to terminate her employment while she could not terminate her employment for any reason under the contract, and the conditions of her employment, *i.e.*, unreasonable hours, taking work home, working Sundays, sexist treatment, and separation from her husband and children, evince unchecked employer power.

●2 McNichols cites *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981) (*Palmateer*), *County of De Witt*, and several sections of the Illinois Administrative Code in support of her argument; however, these authorities do not support her argument.

---

[1]On October 26, 2000, the United States bankruptcy judge denied plan confirmation and dismissed McNichols' chapter 13 bankruptcy proceeding. On December 14, 2000, she unsuccessfully moved to alter or amend the October 26 order. McNichols filed a notice of appeal to the United States District Court on December 15, 2000. The appeal has since been dismissed and no federal proceedings remain pending.

[2]*Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981), used the term "unchecked employer power" when discussing an employee's termination for reporting and agreeing to gather further evidence concerning another employee's possible violation of the criminal code.

*Palmateer* found that an employer may be liable for retaliatory discharge because public policy favors the investigation and prosecution of crimes. *Palmateer*, 85 Ill. 2d at 133. *County of De Witt* held that an arbitrator erred in reinstating a nurse who struck a patient because reinstatement implicated and violated the public policy against mistreatment of the elderly. *County of De Witt*, 298 Ill. App. 3d at 640. The instant three-year employment contract is inapposite to these cases.

Furthermore, the sections of the Illinois Administrative Code cited by McNichols, including in part, the minimum wage law (56 Ill. Adm. Code § 210 (1996)), six-day week law (56 Ill. Adm. Code § 220 (1996)), and the right to privacy in the workplace regulations (56 Ill. Adm. Code § 360 (1996)), do not support defendant's argument. The cited regulations are designed to protect employees in the workplace; however, these regulations do not indicate public policy against contracting for a set time of employment and neither the employment contract nor the working conditions violated any of these regulations.

Employers and employees are free to contract, including contracts for employment for a designated period of time. See, *i.e.*, *Med+Plus Neck & Back Pain Center v. Noffsinger*, 311 Ill. App. 3d 853, 726 N.E.2d 687 (2000) (*Med+Plus*) (two-year employment contract); see also *Royal's Reconditioning Corp. v. Royal*, 293 Ill. App. 3d 1019, 689 N.E.2d 237 (1997) (*Royal*) (30-day notice of termination required in employment contract); *Doherty v. Kahn*, 289 Ill. App. 3d 544, 682 N.E.2d 163 (1997) (covenant not to compete not against public policy). Here, McNichols negotiated the terms of the employment contract, including the deletion of a noncompete clause and an increase in salary, admitted reading all versions given to her, and testified she terminated her employment with Equity for a "better offer." The terms of the contract, agreed to by McNichols, did not allow either party to terminate the employer-employee relationship at will. In addition, the challenged working conditions were not in violation of any laws and do not evince "unforeseen" and "intolerable working conditions" as described by McNichols. Accordingly, the employment contract in the present case did not violate public policy and the circuit court properly denied vacating the arbitrator's award.

## II

McNichols next argues the arbitrator's award of consequential damages in the form of lost profits was a gross error because she did not contemplate such damages at the time she entered into the employment contract.

•3 A court will modify or correct an award where there is an

evident miscalculation of figures or an evident mistake in the description of any person, thing, or property referred to in the award. 710 ILCS 5/13(a)(1) (West 1998). A gross mistake of fact or a gross error of judgment of law will not vitiate an arbitrator's award unless the mistakes or errors are apparent on the face of the award. *Perkins Restaurants Operating Co. v. Van Den Bergh Foods Co.*, 276 Ill. App. 3d 305, 657 N.E.2d 1085 (1995). A court must construe an award so as to uphold its validity whenever possible. *Thomas v. Leyva*, 276 Ill. App. 3d 652, 659 N.E.2d 24 (1995).

●4 In a breach of contract action, the proper measure of damages is the amount of money that will place the injured party in as satisfactory a position as he or she would have been in had the contract been performed. *Royal*, 293 Ill. App. 3d at 1022. Lost profits may be recovered if the plaintiff proves the loss with a reasonable degree of certainty, if defendant's wrongful act resulted in the loss, and if the profits were reasonably within the contemplation of defendant at the time the contract was entered into. The amount of loss need not be proven with absolute certainty; rather, it is necessary that the evidence afford a reasonable basis for the computation of damages. *Royal*, 293 Ill. App. 3d at 1022-23. Lost profit damages in an employment contract are limited by the terms of the contract, such that the breach of an employment contract for failing to give 30 days' notice before terminating employment limits the amount of lost profits to those that would have been earned during the contractual termination period (30 days). *Royal*, 293 Ill. App. 3d at 1024.

●5 Here, the arbitrator found that Equity was entitled to the foreseeable loss in new business and renewal commissions as a result of McNichols' premature departure. It found that a loss of business was "certainly foreseeable" based on both parties' testimony of the importance of personal relationships in the business, the business McNichols built over the years, and the expectation that business would follow her or switch to a different broker once she left Equity's employ. The arbitrator's finding that lost profits were foreseeable and, therefore, a proper component of damages is supported by the facts and did not constitute a gross error of judgment or law. See *Everen Securities, Inc. v. A.G. Edwards & Sons, Inc.*, 308 Ill. App. 3d 268, 719 N.E.2d 312 (1999) (*Everen Securities*) (arbitrators did not commit gross errors of law by choosing to follow witnesses' testimony concerning compensatory damages); *Lemna v. Harry F. Shea & Co.*, 256 Ill. App. 3d 916, 628 N.E.2d 577 (1993) (defendant's disagreement with arbitrator's interpretation of the evidence does not constitute a gross error of law or facts).

We note that the Second District Appellate Court recently held

that, in general, an employer may not collect lost profits from an employee who breached an employment contract. *Med+Plus*, 311 Ill. App. 3d at 857. In *Med+Plus*, an employee prematurely terminated his employment with his employer, relocated to another state, and started his own, noncompeting practice. *Med+Plus*, 311 Ill. App. 3d at 858. The appellate court affirmed the circuit court's ruling that lost profits were not available to the employer, finding that under the facts of that case, the proper measure of damages for breach of the employment contract by an employee was the cost of obtaining other service equivalent to that promised and not performed. *Med+Plus*, 311 Ill. App. 3d at 859. The court distinguished *Royal* on both the facts and the scope of *Royal*'s holding. *Med+Plus*, 311 Ill. App. 3d at 858.

The *Med+Plus* decision does not alter our decision in the instant case. First, our review of an arbitrator's award is more limited than the appellate court's review of a circuit's court award (*Everen Securities*, 308 Ill. App. 3d at 276) as conducted in *Med+Plus*. Furthermore, *Med+Plus* did not hold that lost profits could not be awarded to an employer; rather, it stated "in general" an employer cannot collect lost profits from a breach of contract. *Med+Plus*, 311 Ill. App. 3d at 857. Unlike the plaintiff in *Med+Plus*, here, Equity (and McNichols) provided evidence that lost profits were reasonably contemplated by the parties at the time the contract was entered into and that McNichols' departure caused clients to take their business elsewhere.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and SOUTH, JJ., concur.