THIRD DIVISION

No. 1-08-3285

| | | |
|---|---|---|
| CHICAGO TRANSIT AUTHORITY, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellant, | ) | |
| | ) | No. 08 CH 01388 |
| v. | ) | |
| | ) | Honorable Daniel Riley, |
| AMALGAMATED TRANSIT UNION, | ) | Judge Presiding |
| LOCAL 241, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

This appeal arises out of the discharge of Maurice Gibson, a Chicago Transit Authority (CTA) bus driver, after the CTA discovered he had been convicted of aggravated criminal sexual abuse of his stepdaughter (720 ILCS 5/12-16(b) (West 2006)) and was a registered sex offender. Amalgamated Transit Union, Local 241 (the union), filed a grievance, and an arbitrator reinstated Gibson. On appeal, the CTA contends that the arbitration award should be vacated as against public policy.

## I. BACKGROUND

The union and the CTA are parties to a collective bargaining agreement that covers certain CTA employees, including bus drivers. The agreement contains a provision that the union will not interfere with the CTA's right to discipline its employees covered by the

agreement "where sufficient cause can be shown." It further provides for a binding arbitration procedure for resolving contractual disputes.

The CTA hired Maurice Gibson on May 28, 1987, to be a bus driver. On December 1, 1997, during the time he was employed as a bus driver for the CTA, Gibson pled guilty to aggravated criminal sexual abuse of a family member, a felony. See 720 ILCS 5/12-16(b) (West 2006). The victim was his stepdaughter, who was under 13 years old at the time. This abuse involved both penetration and touching. Gibson told his therapist that the relationship occurred over a period of 6 to 12 months with acts so numerous that he could not count them.

As a result of the conviction, Gibson was sentenced to four years' probation. As part of his probation, he could not have any contact with his stepdaughter, and he could not be in the presence of any minors without another adult being present. Gibson was also required to register with the Illinois State Police as a sex offender for 10 years. His name and likeness were posted on the sex offender registry Web site, but his employment information was not. Gibson was further required to attend a sex-offender treatment program, which he did from 1997 through 2001.

Gibson never informed CTA management of his arrest or conviction. On May 18, 2004, after someone anonymously mailed a copy of his sex offender registry page to the human resources department, the CTA suspended Gibson. On June 9, 2004, Gibson was discharged based on his violations of General Rule 7, obedience to the rules; General Rule 14, personal conduct; and General Rule 24, use of best judgment.

The union filed a grievance challenging Gibson's discharge pursuant to the terms of its

collective bargaining agreement with the CTA. The following evidence was presented at the arbitration on January 10, 2006, and March 14, 2007.

A. Evidence Presented at the Arbitration

Steve Poustinchian, a transportation manager at the CTA, recommended that Gibson be discharged. Gibson gave Poustinchian a copy of an evaluation dated November 19, 2001, showing that Gibson had twice failed polygraphs and that there were indications that he had not been truthful about his activities during treatment. Poustinchian testified that he was concerned about the safety of children, since Gibson came into contact with children as a bus driver. There were several high schools, elementary schools, and parks along Gibson's route, and there was a park near the turnaround for his route. Children frequently ride CTA buses without parents, and sometimes drivers operate a bus that is empty. During the time that Poustinchian was familiar with Gibson's work, there were no customer complaints regarding his conduct. He testified that the buses Gibson drove had cameras and global positioning units.

Robert Gierut, vice-president of employee relations for the CTA, testified that the CTA does not have a policy that a conviction for a felony automatically results in discharge, but he could not remember any cases where a conviction of a felony resulted in less than discharge.

Joel Falco was Gibson's therapist for almost three years, from 1999 to 2001, at the Center for Contextual Change, where Gibson received individual therapy and participated in a specialized treatment group for sex offenders. By 2001, Falco declared Gibson to be one major step short of completing the program, as he had failed to pass two maintenance polygraphs. In fact, Gibson had failed three polygraphs. After his March 16, 1998, polygraph, when he was

being treated by Central Baptist Family Services, the examiner concluded as follows:

"There were significant emotional responses indicative of deception throughout this subject's polygraph records when asked the following questions:

(1) Did you have sexual contact with more than one person under the age of 18? Answer: No.

(2) Are you lying about the number of persons under the age of 18 that you had sexual contact with? Answer: No."

The letter from the examiner further provided that when advised of the results of the exam, Gibson stated that he had a sexual relationship with the 17- or 18-year-old niece of an ex-girlfriend in 1993 or 1994. He further indicated that when he was a college student, he had a sexual relationship with a 17- or 18-year-old woman. Gibson's September 22, 1999, and October 27, 2000, polygraph tests collectively showed deception when he responded that he had not had sexual contact or sexual relations with anyone under the age of 18 since he was on probation or since his last polygraph, and that he had not put his penis in the vagina of anyone under the age of 18 since he was on probation or since his last polygraph. Falco testified that he discussed these polygraph results with Gibson, who stated that he did not know why he failed the exams.

Gibson passed his last polygraph in November 2001. At that time, Gibson told Falco that he would continue treatment in consolidation, a process where clients taper off their treatment and integrate what they learned into their behavior. However, Gibson did not continue with any further treatment. Falco testified that Gibson did not complete the program because he failed to

take an additional maintenance polygraph and to continue treatment in consolidation.

Falco also reevaluated Gibson between the 2006 and 2007 arbitration hearings to assess the risk to the CTA if Gibson returned to work. As part of the evaluation, Gibson completed an ABEL assessment of sexual interest, which showed that his significant sexual interests include adolescent and adult females. Falco testified that this was an "expected profile" for a heterosexual adult male. In 2006, Gibson also passed a polygraph about his sexual behavior since he left therapy in November 2001.

After the 2006 evaluation, Falco concluded that there was little in Gibson's history that would preclude him from resuming safe and responsible employment at the CTA. Falco cited two reasons. First, Gibson's risk level is very low because he had eight years of no reoffenses. Second, his offense was in the context of a long-term relationship as opposed to the relatively public environment that a bus driver works in. Falco also relied on the Static-99 and Stable-2000 tests in determining that Gibson had a low risk of sexual offense during his employment.

Falco stated that Gibson admitted to a sexual relationship with a 17 year old when he was in college, but Gibson never revealed that he had a sexual relationship with a 17 or 18 year old when he was 32 or 33. Falco did not consider the college relationship to be an important factor in his treatment, since the age gap between them was not significant.

The CTA retained Dr. Barry Leavitt, who reviewed Gibson's treatment records, polygraph exams, and other tests to assess Gibson's employability as a bus driver. He disagreed with Falco's conclusion that there is nothing in Gibson's history precluding him from working. Leavitt believed that Gibson is not simply a person who engaged in sexual offending against his

1-08-3285

stepdaughter under particular stress; rather, his other relationships with 17 year olds demonstrate that he does not exercise good judgment and has difficulty controlling his impulses. The fact that Gibson had a sexual relationship with a 17 year old when he was a 22-year-old college student was "not necessarily alarming," but it speaks to poor judgment because "you can get in trouble for that." There were also issues regarding Gibson's truthfulness and his willingness to be open and honest about what he has done. This lack of openness prevented his treatment team from preparing an adequate relapse-prevention plan. Leavitt testified, however, that "polygraphs themselves are questionable in terms of their reliability and validity."

Although he thought that employment was important, Leavitt concluded that Gibson's working as a bus driver is "potentially problematic" because he sees Gibson as more vulnerable to acting in sexually inappropriate ways than was initially documented in the reports. In particular, he noted that as a bus driver, Gibson has potential exposure to women and children.

### B. Arbitrator's Decision

The arbitrator sustained the grievance, finding that there was no nexus between Gibson's off-duty misconduct and his CTA job. He noted that there was no showing that Gibson's criminal behavior harmed the CTA's reputation, adversely affected his ability to perform his duties, or caused other employees to refuse to work with him. There was no evidence that any employee or passenger made a complaint about Gibson's behavior either before or after the conviction, and there was no publicity of the offense or publication of the fact that Gibson worked for the CTA. The arbitrator concluded that the psychologists' opinions did not establish that Gibson's employment as a bus driver would jeopardize the public interest in safe transportation.

The arbitrator noted that the State does not restrict sex offenders from working as a bus driver for the CTA. Indeed, probation officers visited Gibson's home but not his place of employment, and they never contacted anyone at the CTA. He continued that the criminal court "apparently did not have any problem with" Gibson working as a CTA bus driver; in fact, during the initial phase of Gibson's probation, he was under a curfew designed to allow him to go to work. The arbitrator noted that there was no evidence "of any public policy restriction in Illinois or elsewhere" on Gibson's employment as a public transit bus driver.

The arbitrator found that Leavitt was at a "comparative disadvantage" because he, unlike Falco, did not speak to Gibson before rendering his opinion at arbitration. Furthermore, unlike Falco, who had a "relatively long, close therapy experience" with Gibson, Leavitt did not tender a written report. The arbitrator noted Leavitt's conclusions that Gibson had "several years of involving himself with a 17 or 18 year old non-acquaintance" and that there had been a long-standing documented pattern of "difficulty controlling sexual impulses under stress of relationships breaking up or problems with family life" were unsupported by the evidence. He further noted that Leavitt initially believed that Gibson had a sexual relationship with his 17- or 18-year-old niece but corrected the reference to the niece of an ex-girlfriend.

The arbitrator found Leavitt's opinion that it would be "potentially problematic" to reinstate Gibson as a bus driver was "equivocal." While Leavitt was concerned with Gibson's exposure to children and 17- and 18-year-old women riding the bus, "there was no evidence that there had been any problems with 17 or 18 year old women nor any suggestions why someone with [Gibson's] track record with an 11 year old would be a risk to 17 or 18 year old women." Leavitt, relying only on the documents he reviewed, maintained that there was a "possibility, not

likelihood" that Gibson would reoffend. Leavitt's concern of a possibility of reoffending was based on Gibson's deception during the treatment period, Gibson's failure to complete the treatment program, and the lack of a relapse-prevention program in place. However, "he did not express a definite opinion" and instead spoke in terms of what would make him "more comfortable."

The arbitrator relied primarily on Falco's opinions, since he had a longer association with Gibson. Falco concluded that if Gibson were reinstated, the risk of a sexual offense in the course of his employment would be low. He stressed two factors: (1) Gibson had eight years of no reoffenses, and (2) his offense was in the context of an "intimate relationship where he lived with the person and had close contact one-on-one." The arbitrator also noted that while Falco's notes in May 2001 show that Gibson failed a polygraph, passing a polygraph, the most important marker for successful conclusion of treatment, occurred in 2006 when Gibson passed a second polygraph. The arbitrator also cited Falco's opinion that there was no evidence of sexual addiction. Furthermore, the tests that Falco performed in 2006 showed that the risk of a sexual offense during the course of his employment was low.

The arbitrator concluded that Gibson's reinstatement would not violate Illinois public policy. However, he conditioned Gibson's reinstatement on compliance with Falco's recommendation that he resume participation in the sex-offender treatment program for at least three months or until Falco released him from treatment. Although it appeared to the arbitrator that Gibson already integrated what he learned in therapy into his daily life, "such continued counseling would further reduce any risk to the lowest possible level."

The arbitrator awarded back pay only from August 1, 2006, when Gibson passed the

1-08-3285

2006 polygraph, based on "two especially relevant factors." First, Gibson failed to advise the CTA that he was not to be unsupervised in the presence of minor children during his probation. Second, he did not complete the sex-offender treatment program. Gibson's failure to follow Falco's recommendations contributed to a delay in processing his grievance and the scheduling of a second day of arbitration.

## C. Trial Court

The CTA filed a petition to vacate the arbitrator's award, arguing that the award violated public policy, and the union filed a counterpetition to enforce the award. The parties filed cross-motions for summary judgment. On October 22, 2008, the court granted the union's counterpetition and motion for summary judgment and denied the CTA's petition and motion. This appeal followed.

## II. ANALYSIS

The CTA argues on appeal that the reinstatement of a convicted sex offender as a CTA bus driver violates Illinois public policy. It contends that the arbitrator's decision to reinstate Gibson threatens harm to children because Gibson, a child sex offender, hid his conviction from the CTA, violated his probation on an ongoing basis by having unsupervised contact with minors while driving the bus, and failed to complete his treatment program due to his inability to pass a polygraph exam. It further contends that the order threatens harm to the CTA because (1) if passengers knew that one of the CTA's bus drivers was a child sex offender, they would feel less safe on the system and parents would be much less likely to allow their children to use the system unescorted and (2) if a common carrier were to voluntarily hire a convicted sex offender, with full knowledge of his record, it would expose itself to liability for negligent hiring.

-9-

Judicial review of an arbitral reward is "extremely limited." *Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168, 174 (2001). The rationale for the limited review of an award interpreting a collective bargaining agreement is that "the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge." *American Federal of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 305 (1996) (*AFSCME II*). A labor arbitration award must be enforced if the arbitrator acts within his scope of authority and the award draws its essence from the parties' collective bargaining agreement. *American Federal of State, County & Municipal Employees v. State*, 124 Ill. 2d 246, 254 (1988) (*AFSCME I*).

However, a court will vacate the award if it is repugnant to the established norms of public policy. *Chicago Fire Fighters Union*, 323 Ill. App. 3d at 174. "The 'public policy' exception is narrow and its successful invocation requires a clear showing that the award violates some explicit public policy." *City of Highland Park v. Teamster Local Union No. 714*, 357 Ill. App. 3d 453, 460 (2005). The contract as interpreted by the arbitrator must violate some explicit public policy that is " 'well-defined and dominant' and ascertainable 'by reference to the laws and legal precedents and not from generalized considerations of supposed public interest.' " *AFSCME II*, 173 Ill. 2d at 307, quoting *W.R. Grace & Co. v. Local Union No. 759*, 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183 (1983). Accordingly, the public policy of a state must be determined by its constitution, laws, and judicial decisions. *AFSCME I*, 124 Ill. 2d at 260. However, the "reinstatement of an employee who has violated an important public policy does not necessarily itself violate public policy." *City of Highland Park*, 357 Ill. App. 3d at 462.

To vacate an award under the public policy exception, this court is required to undertake

1-08-3285

a two-step analysis. The threshold question is whether a well-defined and dominant public policy can be identified. *County of DeWitt v. American Federation of State, County & Municipal Employees, Council 31*, 298 Ill. App. 3d 634, 637 (1998). If so, the court must determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated public policy. *County of DeWitt*, 298 Ill. App. 3d at 637. As our supreme court has cautioned, "although a rote recitation of the exception's two-prong test can be easily made, the exception's ultimate applicability to a case is necessarily fact dependent." *AFSCME II*, 173 Ill. 2d at 311.

The CTA argues that the arbitrator's decision reinstating Gibson violated the well-defined and dominant public policies favoring the safe and secure transportation of the public, including children, and the protection of the public, especially juveniles, from convicted sex offenders. The union does not dispute that these policies exist.

In support of its argument of a policy favoring the safe and secure transportation of the public, the CTA cites article XIII, section 7, of the Illinois Constitution, which provides as follows:

> "Public transportation is an essential public purpose for which public funds may be expended. The General Assembly by law may provide for, aid, and assist public transportation, including the granting of public funds or credit to any corporation or public authority authorized to provide public transportation within the State." Ill. Const. 1970, art. XIII, §7.

The CTA's enabling statute, the Metropolitan Transit Authority Act, permits the CTA to "own, operate, and maintain for public service a transportation system." 70 ILCS 3605/6 (West 2006).

-11-

1-08-3285

It also requires the CTA to "cooperate with the Regional Transit Authority for the protection of *** users of public transportation facilities against crime and unsafe conditions." 70 ILCS 3605/9a(f) (West 2006). Section 27a of the Metropolitan Transit Authority Act requires the CTA to spend funds to protect "against crime its employees and consumers." 70 ILCS 3605/27a (West 2006).

A related policy is the safe transportation of children. The CTA contends that it is an essential means of transportation for children traveling to and from school, and it facilitates that transportation by offering students reduced fares. See 70 ILCS 3605/27a (West 2006). *Board of Education of School District U-46 v. Illinois Educational Labor Relations Board*, 216 Ill. App. 3d 990, 1000 (1991), a case involving a school bus driver, concluded that "several statutes enacted by the legislature indicate there is a public policy favoring the safe transportation of school children." See also *Central Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 388 Ill. App. 3d 1060, 1069 (2009) (recognizing a public policy concerning the safety of school children).

A public policy also exists favoring the protection of the public, including children, from convicted sex offenders. The Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 2006)) requires sex offenders to register with the Illinois State Police and provide "a current photograph, current address, current place of employment," and other information. 730 ILCS 150/3(a) (West 2006). The State police must maintain a publicly accessible database of sex offender information. 730 ILCS 152/115, 120 (West 2006). In addition, child sex offenders are prohibited from loitering within 500 feet of a school, residing within 500 feet of a playground "or a facility providing programs or services exclusively directed toward persons under 18 years

1-08-3285

of age," or loitering within 500 feet of a park when children are present. 720 ILCS 5/11-9.3(b), 9.4(b-5) (West 2006). They are further prohibited from being present at a school or "in any conveyance owned, leased, or contracted by a school to transport students to or from school *** when persons under the age of 18 are present *** in the conveyance." 720 ILCS 5/11-9.3(a) (West 2006). See also 625 ILCS 5/6-106.1(a) (West 2006) (sex offenders cannot qualify for a school-bus driver permit). It is unlawful for a child sex offender to be employed by any "facility providing programs or services exclusively directed towards persons under the age of 18." 720 ILCS 5/11-9.4(c) (West 2006). Recently enacted Public Act 96-118 (effective Aug. 4, 2009) further prohibits child sex offenders from knowingly operating a vehicle designed for the retail sale of food or beverages, emergency vehicles, or rescue vehicles.

These statutes are consistent with courts' recognition that children are frequently victims of sexual abuse. In *People v. Huddleston*, 212 Ill. 2d 107, 137 (2004), our supreme court noted, "Suffice it to say that the incidence of child molestation is a matter of grave concern in this state and others, as is the rate of recidivism among the offenders." See also *McKune v. Lile*, 536 U.S. 24, 34, 153 L. Ed. 2d 47, 57, 122 S. Ct. 2017, 2025 (2002) (describing the risk of recidivism posed by sex offenders as "frightening and high").

Having determined that well-defined and dominant public policies exist in favor of the safe and secure transportation of the public, including children, and the protection of the public, especially juveniles, from convicted sex offenders, we next determine whether the arbitrator violated those policies by reinstating Gibson.

We find that the arbitrator's award reinstating Gibson violates these public policies. The arbitrator reinstated Gibson despite finding that Gibson did not complete the sex-offender

-13-

treatment program, failed several polygraphs concerning his sexual behavior, and did not pass his final polygraph until 2006, some five years after he left the program. Gibson himself told his therapist that he engaged in repeated sexual acts with his 12-year-old stepdaughter on so many occasions that he could not count them.

The arbitrator found that, at the time of the hearings in 2006 and 2007, Gibson had no "present restrictions" on contact with minor children. He also found that Gibson was offense-free for eight years and concluded that there was "every indication that by 2007 Gibson had demonstrated that he had mastered the lessons learned from the years of treatment concluded in 2001." However, at the time that the CTA terminated Gibson, he had not completed the sex-offender treatment program, had failed several polygraphs, and had not taken his final polygraph. In addition, during his employment, Gibson was serving a four-year probation term and was a registered sex offender; Gibson hid both of these facts from the CTA. The arbitrator recognized that "the CTA clearly had a right to know and evaluate alternatives. It was imperative that Gibson advise them of this restriction." (Emphasis in original.)

Gibson had surely been violating the terms of his probation, which prohibited him from being in the presence of minors without another adult being present. It is undisputed that unaccompanied school children frequently ride CTA buses, and there were several high schools, elementary schools, and parks along Gibson's route. We note that when a bus is loaded with children, one of them has to be the last one off the bus. Thus, it is inconceivable that Gibson did not violate the terms of his probation during his employment with the CTA by being alone with an unaccompanied minor. That Gibson may have integrated lessons from therapy into his daily life by the year 2007 does not alter the omissions and probation violations that occurred before

the CTA discharged him.

The union argues that while section 9.3(a) of the Criminal Code of 1961 (720 ILCS 5/11-9.3(a) (West 2006)) prohibits a sex offender from working as a school bus driver, nothing prohibits a sex offender from working as a public transit bus driver. Indeed, the Sex Offender Registration Act contemplates that sex offenders will continue to be employed, since it requires them to report their current place of employment. 730 ILCS 150/3(a) (West 2006). However, while the legislature declared that sex offenders *cannot* work in certain jobs--like driving a school bus, ice cream truck, or ambulance--it did not state that a sex offender *can* work in certain other jobs. In *Illinois Nurses Ass'n v. Board of Trustees of the University of Illinois*, 318 Ill. App. 3d 519 (2000), for example, the court did not cite a statute that specifically required nurses to order medication on a timely basis or to give ordered medication. Nevertheless, we found that the reinstatement of a nurse who failed to do these things violated public policy because she jeopardized the lives of two patients in a three-day period. *Illinois Nurses Ass'n*, 318 Ill. App. 3d at 531.

The reinstatement of Gibson could also expose the CTA to substantial liability. "Due to the unique control it possesses over passengers' safety," a common carrier owes them the highest duty of care. *Sheffer v. Springfield Airport Authority*, 261 Ill. App. 3d 151, 154 (1994). "That duty continues until the passenger has left the carrier and the place where passengers are discharged." *Sheffer*, 261 Ill. App. 3d at 154.

Liability for negligent hiring or retention results "when a particular unfitness of an employee gives rise to a particular unfitness of harm to third parties." *Van Horne v. Muller*, 185 Ill. 2d 299, 313 (1998). In *Van Horne*, the plaintiff alleged that a radio deejay defamed him and

that the radio station that employed the deejay should have known that he would make false, defamatory statements on the air. The court concluded that the mere fact that the deejay previously engaged in "offensive or outrageous conduct during his radio programs does not establish that he had a propensity to make false, defamatory statements." *Van Horne*, 185 Ill. 2d at 314. Such "outrageous and offensive conduct" was not sufficient to put the radio station on notice that the deejay would make false, defamatory statements on the air if it hired him. *Van Horne*, 185 Ill. 2d at 314.

Similarly, in *Giraldi v. Community Consolidated School District No. 62*, 279 Ill. App. 3d 679 (1996), the plaintiff sued a school district for negligent hiring after its bus driver sexually abused a student. The bus driver's prior work history only showed that the driver had a tendency to be late. "But it wasn't tardiness, absenteeism, or irregular schedules that caused harm to [the victim]." *Giraldi*, 279 Ill. App. 3d at 691. Thus, this court concluded that there was no "factual or logical relationship between that knowledge" and the abuse of the victim. *Giraldi*, 279 Ill. App. 3d at 692.

Here, unlike the employers in *Van Horne* and *Giraldi*, the CTA is aware of Gibson's proclivities with children, as he pled guilty to aggravated criminal sexual abuse of his 12-year-old stepdaughter. See also *Doe v. Chicago Board of Education*, 339 Ill. App. 3d 848, 858 (2003) (sustaining developmentally disabled student's count against school board for failing to have a monitor on a school bus despite its knowledge that a male student with a sexually deviant history rode the bus). The arbitrator even recognized the CTA's vulnerability to substantial liability as a result of reinstating Gibson to be a "justifiable concern." It is also questionable whether Gibson was offense-free for eight years before the 2006 and 2007 arbitration hearings, as the arbitrator

found, since Gibson's September 22, 1999, and October 27, 2000, polygraph tests showed deception when he responded that he had not had sexual contact or sexual relations with anyone under the age of 18 since he was on probation or since his last polygraph.

We do note that even though the arbitrator reinstated Gibson, the arbitrator's award provided that Gibson was punished, as he essentially was suspended without pay from June 9, 2004, to August 1, 2006. He also served four years' probation. The fact that the grievant was punished was a factor that the courts have considered in reviewing an arbitrator's decision. See *AFSCME I*, 124 Ill. 2d at 263. *AFSCME I* "specifically recognized the long-standing principle that an employee's amenability to discipline is a factual determination [that] cannot be questioned or rejected by a reviewing court." *AFSCME II*, 173 Ill. 2d at 331-32. In *Department of Central Management Services v. American Federation of State, County & Municipal Employees*, 222 Ill. App. 3d 678 (1991), a parole officer was convicted in federal court of making false statements to the Department of Housing and Urban Development, a felony. He was discharged on the basis that his criminal conduct brought discredit to the Department of Corrections and constituted a violation of Department rules. The arbitrator found that discharge was not warranted, and on appeal, the Department argued that the award violated public policy. This court disagreed, noting that other felons are employed as parole officers, the grievant's employment record was substantially unblemished, he was independently punished for his criminal act, and the reinstatement was ordered without back pay. *Department of Central Management Services*, 222 Ill. App. 3d at 689.

That Gibson was punished by being suspended without pay does not alter our finding, however. The arbitrator conditioned Gibson's reinstatement on compliance with Falco's

recommendation that he resume participation in the sex-offender treatment program for at least three months or until Falco released him from treatment. According to the arbitrator, "such continued counseling would further reduce any risk to the lowest possible level." It is contradictory for the arbitrator to be concerned about further treatment if there is no public policy violation. Such conditions also permit Gibson to benefit from his noncompliance with the sex offender treatment program, since he did not make the effort to complete the program in 2001.

The arbitrator and the union put great emphasis on the alleged lack of nexus between Gibson's "personal off-the-job misconduct and CTA operations to warrant his discharge." The arbitrator noted that there was no showing that Gibson's criminal misbehavior harmed the CTA's reputation, adversely affected his ability to perform his duties, or caused other employees to refuse to work with him.

In *AFSCME I*, a patient died while two mental health technicians were on an unauthorized trip to a flea market. However, the patient was not assigned to the ward where the technicians worked, so the violation "did not result in any injury to or abusive treatment of a resident." *AFSCME I*, 124 Ill. 2d at 263. The arbitrator reinstated the technicians. On appeal, our supreme court found that the reinstatement did not violate the public policy of "compassionate care for the mentally disabled." *AFSCME I*, 124 Ill. 2d at 262. "There is simply no policy that mandates the discharge of all employees found guilty of mistreatment of a service recipient when the arbitrator expressly finds that the grievants were exemplary mental health employees, when punishment has been imposed, and where no nexis [*sic*] exists between the infraction and the patient's tragic death." *AFSCME I*, 124 Ill. 2d at 263. See also *Board of*

1-08-3285

*Education of School District U-46 v. Illinois Educational Labor Relations Board*, 216 Ill. App. 3d 990 (1991).

In *AFSCME II*, however, the supreme court retreated from its earlier ruling regarding the need for a nexus. In *AFSCME II*, a DCFS specialist stated in a written report that three children were "doing fine" even though they had died in a fire the month before. She also failed to submit care plans for the family for three years. DCFS discharged her, and an arbitrator reinstated her. Our supreme court found that reinstatement violated public policy because it "cannot be said to in any way promote the welfare and protection of children." *AFSCME II*, 173 Ill. 2d at 318. The dissent in *AFSCME II* criticized the majority because there was no nexus between the employee's misconduct and the harm suffered. *AFSCME II*, 173 Ill. 2d at 336 (Heiple, J., dissenting), citing *AFSCME I*, 124 Ill. 2d at 260-65. The majority found that "this court has never ruled that such a nexus *must* exist and to suggest otherwise simplifies the holding" of *AFSCME I*. (Emphasis in original.) *AFSCME II*, 173 Ill. 2d at 332. The court noted that *AFSCME I* identified two other factors that were equally important: whether the award sanctioned violations of the law and whether it posed a threat of harm to third persons. *AFSCME II*, 173 Ill. 2d at 332.

The court in *AFSCME II* concluded that "when public policy is at issue, it is the court's responsibility to protect the public interest at stake. That is why courts will not give the drunken pilot the opportunity to fly a commercial airliner again even though no harm befell his passengers." *AFSCME II*, 173 Ill. 2d at 333. Similarly, the fact that Gibson did not sexually abuse a child during work hours or on his bus does not prevent us from finding that his reinstatement violates public policy. Furthermore, while the arbitrator touted the lack of

1-08-3285

employee or passenger complaints about Gibson's behavior, we note that at least one person was offended that a child sex offender was working as a CTA bus driver: the person who anonymously mailed Gibson's sex offender registry to human resources.

### III. CONCLUSION

For the foregoing reasons, we find that the arbitrator's award violates public policy. Accordingly, we reverse.

Reversed.

QUINN, J., concurs.

JUSTICE STEELE, specially concurring in part and dissenting in part:

While I agree with the majority's ultimate conclusion that Gibson should not operate a bus, I respectfully disagree with the majority's conclusion that he should also be discharged and the reasoning articulated in reaching these conclusions. From the outset, I find Gibson's underlying criminal behavior reprehensible. However, we are charged, as the reviewing court, to determine if the arbitrator's award should be upheld, and not penalize Gibson for his criminal conduct, in accordance with the law. When considering the two-part analysis applied in determining whether the award violates public policy, I believe the record before us fails to demonstrate the award clearly contravened the public policies referenced to warrant disturbing the award.

As the majority notes, judicial interference with an arbitration award is extremely limited. Slip op. at 10. Judicial review of an arbitration award is "extremely limited" and "a

-20-

1-08-3285

court must construe an award, if possible, as valid." *American Federation of State, County & Municipal Employees v. State of Illinois*, 124 Ill. 2d 246, 254 (1988) (hereinafter *AFSCME I*). A court may not reverse an arbitrator's decision simply because it is contrary to the manifest weight of the evidence. See 710 ILCS 5/12, 13 (West 2006). Any question regarding the interpretation of a collective bargaining agreement is to be answered by the arbitrator, and we will not overrule that construction merely because our interpretation differs from that of the arbitrator. *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 305 (1996) (hereinafter *AFSCME II*), citing *AFSCME I*, 124 Ill. 2d at 254. The majority opinion correctly notes that a court will vacate an arbitration award that is repugnant to the established norms of public policy. Slip op. at 10. However, as the majority opinion also acknowledges, the "reinstatement of an employee who has violated an important public policy does not necessarily violate public policy." *City of Highland Park v. Teamster Local Union No. 714*, 357 Ill. App. 3d 453, 462 (2005).

Yet, while the parties bargained for binding arbitration, the arbitrator's findings, based upon his interpretation of the parties' collective bargaining agreement and after hearing testimony from various witnesses, including a therapist who interacted with Gibson during his treatment period, as well as considering public policy arguments, are now rejected. I believe that the majority's reasoning will be construed to require discharging all municipal bus drivers who are convicted of a sex offense or another felony, or who fail to report their sex offender status, without regard to the bargained-for employment contract and the law as it currently stands, and disturbing arbitration awards reinstating employment following any such conviction or failure as violating public policy.

-21-

1-08-3285

As the majority acknowledges, the Illinois legislature has not enacted any statute specifically prohibiting registered sex offenders from operating a public transit vehicle. Slip op. at 15. Statutes exist expressly prohibiting sex offenders from operating a school bus. 720 ILCS 5/11-9.3(a) (West 2006); see also 625 ILCS 5/6-106.1(a) (West 2008) (convicted sex offenders are ineligible to receive a school bus driver permit). As recently as August 2009, by Public Act 96-118, the legislature imposed additional restrictions for sex offenders regarding operation of certain vehicles by adding a provision in the Criminal Code of 1961 prohibiting such individuals from operating an ice-cream truck or ambulance. Public Act 96-118, eff. August 4, 2009 (adding 720 ILCS 5/11-9.4 (c-8)). However, the legislature's amendment did not include any restrictions for operating other types of vehicles, *e.g.*, common carriers or public transit vehicles. If the legislature intended to prohibit sex offenders from operating public bus transit vehicles, the legislature would have included express language doing so. Simply put, these statutes cannot be construed to include a prohibition in operating a public transit vehicle absent express language indicating its intent to do so. See *People v. Ellis*, 199 Ill. 2d 28, 39 (2002) (in effecting legislative intent by viewing the statute's plain language, "[the court] must not depart from the statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express"); see also *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184-85 (2009) (same).

Moreover, even if a bus driver's route includes service stops picking up minor students, that, in and of itself, does not transform the public transit bus into a "school bus" to fall under the statute's umbrella. See slip op. at 14-15. I find the statute's language plain and clear as not including a public transit vehicle as a restricted vehicle. Assuming *arguendo* that the term

-22-

"school bus" is ambiguous in light of the scenario presented by the majority, any ambiguity in the criminal statute is construed in favor of the accused pursuant to the rule of lenity followed by Illinois courts. See *People v. Jones*, 223 Ill. 2d 569, 581 (2006), citing *People v. Davis*, 199 Ill. 2d 130, 140 (2002); see also *People v. Williams*, 393 Ill. App. 3d 77, 86-87 (2009), citing *United States v. Santos*, 553 U.S. ____, ____, 170 L. Ed. 2d 912, 920, 128 S. Ct. 2020, 2025 (2008). Certainly, if the legislature specifically intended to prohibit sex offenders from operating public transit vehicles, the legislature would have enacted legislation containing plain language expressing its intent to do so. As the legislature makes the laws, which we merely follow, the legislature should revisit the statute to declare any intent to restrict sex offenders from operating public transit vehicles. See *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394-95 (1998) (courts apply legislation as written and "must not rewrite statutes to make them consistent with the court's idea of orderliness and public policy").

Indeed, if Gibson's registration status would have affected his ability to continue in his position, certainly steps would have been taken to notify the CTA, his employer, to meet the safeguards of the registration statute and his probation terms. Yet, the record is absolutely devoid of any notice to the CTA that Gibson could no longer work in a bus driver capacity given his conviction and registry status or even that Gibson failed to disclose his CTA employment as part of his conviction and registration.

Furthermore, the record reveals a CTA manager testified that a felony conviction does not automatically result in discharge from employment. As was raised at oral argument in a question posed to counsel, I remain perplexed that an employee with 17 years of employment as of the date of his termination was not given the opportunity to continue his employment in

another position.  The arbitrator's award also references a prior arbitration award (referred to therein as <u>Bus Servicer</u> award) where the discharge of a sex offender's discharge for off-duty misconduct involving a member of the public was overturned.[1]  As the record reveals no specific internal rule or contractual agreement mandating disclosure of Gibson's plea and registry status, his nondisclosure did not violate any express work rules.  Just like the legislature should revisit the issue of enacting express legislation restricting sex offenders from operating public transit vehicles, the CTA, too, must promulgate a rule expressly stating if the CTA desires to require express disclosure of such a conviction.  If automatic discharge is predicated upon violation of such an express rule, the parties' collective bargaining agreement should also incorporate express language to that effect to justify an automatic discharge.  Clear language delineating the consequences for violating an express disclosure rule would avoid misinterpretation and alleviate any concerns the CTA has regarding exposure to liability in providing safe and secure transportation.

In this case, the arbitrator emphasized he benefitted from the testimony of opinion witnesses in making his findings.  Falco, the then program director who held a master of arts in clinical social work and saw Gibson during his treatment period, opined that Gibson's risk of recidivism in the course of his employment was low based upon certain factors.  The arbitrator highlighted that Leavitt, the CTA's retained expert who neither treated nor met with Gibson, "appeared to agree" with Falco's assessment.  Indeed, the arbitrator summarized Leavitt's

---

[1]In the arbitrator's decision, he also noted the CTA unsuccessfully sought to vacate the <u>Bus Servicer</u> arbitration award in the circuit court and highlighted that " 'the violation of public policy must be clearly shown.' "

testimony as stating "there was only 'a *possibility*, _not likelihood_' that Gibson would reoffend." (Emphasis in original.) Although Leavitt still harbored concern of a mere "possibility," the arbitrator apparently found Falco's opinions more insightful given his close association with Gibson and knowledge about Gibson's treatment background.

I also respectfully disagree with the majority's conclusion that the arbitrator's conditional reinstatement was "contradictory *** if there is no public policy violation." Slip op. at 18. Rather, the remedy fashioned was consistent with the opinion testimony presented to the arbitrator that the risk of recidivism was low. See *AFSCME II,* 173 Ill. 2d at 322-23, citing *AFSCME I*, 124 Ill. 2d at 263 (finding the court "would be obliged to affirm the award" if the arbitrator reinstates an employee after making "a rational finding that the employee can be trusted to refrain from the offending conduct" and citing cases where arbitrators' conditioned reinstatements or findings of repeated conduct were unlikely upheld by courts). Here, the arbitrator chose Falco's expert opinion over Leavitt's and presented rational reasons for doing so.

Lastly, although one person did ultimately complain about Gibson's sex offender registration, I suspect that the action was primarily motivated to embarrass, humiliate, and trigger adverse employment action against Gibson, which did indeed occur, rather than to assist the CTA in providing safe transportation for minors. Nonetheless, I believe that had Gibson promptly reported the matter to the CTA, the parties would have had ample opportunity to explore reassignment to a position that involved minimal public contact to avoid the loss of long-term and untarnished employment while effecting the CTA's goals of providing safe and secure transportation for its passengers. As I conclude, in following the law as stated, the arbitrator's

decision to reinstate Gibson's employment should not be disturbed, but I believe Gibson should be employed in a different capacity other than a bus driver.

1-08-3285

Please Use Following Form:

**Complete TITLE of Case**

CHICAGO TRANSIT AUTHORITY,

Plaintiff-Appellant,

v.

AMALGAMATED TRANSIT UNION, LOCAL 241,

Defendant-Appellee.

**Docket No.**

**COURT**

**Opinion Filed**

**JUSTICES**

No. 1-08-3285
Appellate Court of Illinois
First District, THIRD Division

March 24, 2010
(Give month, day and year)

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Quinn, J.                                                            concurs
Steele, J.                                                    Specially concurs

Lower Court and Trial Judge(s) in form indicated in the margin:

Honorable Daniel Riley        Judge Presiding.

**APPEAL from the Circuit Ct. of Cook County, Criminal Div.**

**For APPELLANTS, John Doe, of Chicago.**

**For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)**

Also add attorneys for third-party appellants or appellees.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.

Attorney for **Plaintiff-Appellant:**    Steven J. Teplinsky, Dorothy M. Brackett
Michael Best & Friedlich LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 2000
Chicago, IL 60601
Phone: 312.222.0800

Attorneys for **Defendant-Appellee:**    Sherrie E. Voyles, Taylor E. Muzzy
Jacobs, Burns, Orlove, Stanton & Hernandez
122 S. Michigan Avenue, Suite 1720
Chicago, IL 60603-6145
Phone: 312.372.1646