2018 IL App (1st) 170702

Nos. 1-17-0702 & 1-17-1851 (consolidated)

Opinion filed June 15, 2018

Fifth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE CHICAGO TRANSIT AUTHORITY, | ) ) ) | Appeal from the<br>Circuit Court of<br>Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) ) | No. 16 CH 11310<br>Honorable |
| v. | ) ) ) | David B. Atkins,<br>Judge, presiding. |
| AMALGAMATED TRANSIT UNION LOCAL 308, | ) ) | No. 17 CH 717<br>Honorable |
| Defendant-Appellee. | ) ) ) | Neil H. Cohen,<br>Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1     Two arbitration awards issued in 2016 found that the Chicago Transit Authority (CTA)

had violated its collective bargaining agreement with the Amalgamated Transit Union Local 308

(ATU) when the CTA unilaterally implemented rules that directly affected certain rights of the

workers concerning their schedule choices and work hours. Thereafter, the circuit court denied

the CTA's petitions to vacate the arbitration awards.

¶ 2     On appeal, the CTA argues that the arbitration awards should be vacated because (1) they are contrary to the well-established Illinois public policy requiring the CTA to provide safe mass transportation to the riding public or (2) the arbitrators usurped the CTA's nondelegable statutory right and duty to provide safe mass transportation to the riding public.

¶ 3     For the reasons that follow, we affirm the judgments of the circuit court that affirmed the arbitration awards.

¶ 4                                    I. BACKGROUND

¶ 5     This appeal arises from a dispute between the CTA and the ATU over the CTA's unilateral implementation of several new rules following the 2014 derailment of a CTA train at the end of the Blue Line at the station at O'Hare International Airport. Specifically, the train, which was operated by an employee represented by the ATU, overran the bumper at the O'Hare station and partially ascended the escalator leading to the airport. Approximately 30 people claimed injuries. The CTA concluded that operator fatigue caused the derailment and implemented several operational changes to enhance the overall safety of the CTA's customers and employees. However, the ATU argued that these unilateral operational changes violated the parties' collective bargaining agreement, and it filed grievances and an unfair labor practice charge against the CTA. Two separate arbitration proceedings addressed the unilateral changes imposed by the CTA.

¶ 6     In the first arbitration proceeding, the arbitrator heard the grievances concerning whether the CTA had violated the collective bargaining agreement by, *inter alia*, (1) requiring a minimum of 10 hours of rest time between shifts for both "picked" and "extra board" work, (2) requiring full-time temporary flaggers (FTTFs) who were qualified to operate trains to pick

32 hours of motor runs per week, and (3) limiting FTTFs and rapid transit operators (RTOs) in their first 12 months of employment to a maximum of 32 hours per week of train operation.

¶ 7    The arbitrator issued an award in June 2016 sustaining the grievances in part and denying the grievances in part. The arbitrator found that, despite the CTA's compelling interest in enhancing operational safety, the CTA had violated specific obligations contained in the plain terms of the collective bargaining agreement. Specifically, when the CTA unilaterally increased the minimum time off between shifts from 8 to 10 hours, this change had a major impact on employees' substantive rights to pick any shift or shifts as long as they had 8 hours between work days. Furthermore, by requiring the FTTFs qualified to operate trains to pick 32 hours of motor runs per week, the CTA had infringed on a contractually protected right that "picking" was to be done by seniority. Finally, by limiting first-year RTOs to 32 hours of train operation per week, the CTA had infringed on their right to exercise their seniority and pick their work assignments and schedules. The arbitrator ordered the CTA to cease and desist enforcement of the rules found to be in violation of the collective bargaining agreement.

¶ 8    The CTA filed a petition to vacate this arbitration award, and the ATU filed a cross-petition to affirm the award. In March 2017, the circuit court confirmed the arbitration award and entered judgment in favor of the ATU.

¶ 9    Meanwhile, in the second arbitration proceeding, another arbitrator heard grievances concerning whether the CTA violated the collective bargaining agreement by (1) limiting rail operations employees to 12 hours of work a day in any 14-hour period and (2) requiring that all rail operations employees work no more than six days within any consecutive seven-day period.

¶ 10 The arbitrator issued an award in October 2016 sustaining the grievances in part and denying the grievances in part. The arbitrator found that the CTA's rule limiting rail operations employees to 12 hours of work a day in any 14-hour period was a clear breach of the collective bargaining agreement. The arbitrator recognized that the CTA had a compelling interest to enhance safety and that the rule was a reasonable attempt to advance this interest; however, the arbitrator concluded that the rule violated the plain language of the collective bargaining agreement. The arbitrator found that the CTA was required to negotiate this change and ordered the CTA to rescind the rule and make all affected employees whole. The matter was remanded to the parties to determine the appropriate remedy.

¶ 11 The CTA filed a petition to vacate this arbitration award, and the ATU filed a cross-petition to affirm the award. In July 2017, the circuit court confirmed the award and entered judgment in favor of the ATU.

¶ 12 The CTA timely appealed the denials of its petitions to vacate, and this court consolidated the appeals on review.

¶ 13                                II. ANALYSIS

¶ 14 On appeal, the CTA contends that the arbitration awards should be vacated because they are contrary to a well-established Illinois public policy that requires the CTA to provide safe mass transportation to the riding public. Alternatively, the CTA contends that this dispute was not arbitrable because the CTA has a nondelegable statutory right and duty to provide safe mass transportation to the riding public.

¶ 15                              A. The Public Policy Exception

¶ 16     A court's review of an arbitration award is extremely limited, and courts must construe

arbitration awards, if possible, as valid. *American Federation of State, County & Municipal*

*Employees, AFL-CIO v. State*, 124 Ill. 2d 246, 254 (1988). Where, as here, the arbitration

involved a collective bargaining agreement, a court, consistent with section 12(e) of the Uniform

Arbitration Act (710 ILCS 5/12(e) (West 2016)), will disturb the arbitration award only on the

common-law grounds that existed prior to the enactment of the Uniform Arbitration Act, *i.e.*,

"instances of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question

to arbitration." *American Federation of State, County & Municipal Employees, AFL-CIO v.*

*Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996) (*AFSCME 1996*).

> "The rationale for the limited review of an award interpreting a collective
>
> bargaining agreement is that the parties have contracted to have their disputes
>
> settled by an arbitrator, rather than by a judge. [Citation.] A labor arbitration
>
> award must be enforced if the arbitrator acts within his scope of authority and the
>
> award draws its essence from the parties' collective bargaining agreement.
>
> [Citation.]
>
>        However, a court will vacate the award if it is repugnant to the established
>
> norms of public policy. [Citation.] The public policy exception is narrow and its
>
> successful invocation requires a clear showing that the award violates some
>
> explicit public policy. [Citation.] The contract as interpreted by the arbitrator must
>
> violate some explicit public policy that is well-defined and dominant and
>
> ascertainable by reference to the laws and legal precedents and not from

generalized considerations of supposed public interest. [Citation.] Accordingly, the public policy of a state must be determined by its constitution, laws, and judicial decisions. [Citation.] ***

To vacate an award under the public policy exception, this court is required to undertake a two-step analysis. The threshold question is whether a well-defined and dominant public policy can be identified. [Citation.] If so, the court must determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated public policy. [Citation.] As our supreme court has cautioned, although a rote recitation of the exception's two-prong test can be easily made, the exception's ultimate applicability to a case is necessarily fact dependent. [Citation.]" (Internal quotation marks omitted.) *Chicago Transit Authority v. Amalgamated Transit Union, Local 241*, 399 Ill. App. 3d 689, 695-96 (2010) (*ATU Local 241*).

The question of whether an award violated public policy is one of law, which we review *de novo*. *City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 20.

¶ 17     The CTA does not contend that the arbitrators exceeded their authority or that the awards failed to draw their essence from the collective bargaining agreement. Instead, the CTA argues that this court should vacate the arbitration awards because the awards violate the well-defined and dominant Illinois public policy requiring the CTA to provide safe mass transportation to the public.

¶ 18 The arbitration awards at issue here held that the CTA could not bypass the collective bargaining process and unilaterally impose rules that directly affected certain rights of the workers concerning their schedule choices and work hours. These awards cannot be vacated under the public policy exception unless the CTA clearly shows that the awards violate an explicit, well-defined, and dominant public policy that is ascertainable by reference to our laws and legal precedents.

¶ 19 The CTA cites the Illinois Constitution and refers to four provisions of its enabling statute, the Metropolitan Transit Authority Act (Transit Act) (70 ILCS 3605/1 *et seq.* (West 2016)), to show that the awards violate an explicit, well-defined and dominant public policy favoring safe public transit. Specifically, article XIII, section 7, of the Illinois Constitution provides that "[p]ublic transportation is an essential public purpose" and the General Assembly "may provide for, aid, and assist public transportation." Ill. Const. 1970, art. XIII, § 7. Furthermore, section 6 of the Transit Act grants the CTA the "power to acquire, construct, own, operate and maintain for public service a transportation system." 70 ILCS 3605/6 (West 2016). Section 9a(f) of the Transit Act empowers the CTA to cooperate with the Regional Transportation Authority to protect public transit facilities, employees, and users of public transportation facilities from crime and unsafe conditions, and this cooperation could include agreements to coordinate or merge police or security forces. *Id.* § 9a(f). Section 31 of the Transit Act grants the Chicago Transit Board the power to pass ordinances and make rules and regulations to regulate the use, operation, and maintenance of its property and to assess fines to enforce this power. *Id.* § 31. Finally, section 53 of the Transit Act requires the Chicago Transit

Board to "develop written protocols to respond to medical and sanitation emergencies and to other safety hazards." *Id.* § 53.

¶ 20    The cited provisions of the Illinois Constitution and Transit Act do not show a well-defined public policy regarding the safety of transit workers' scheduling options or work hours. Rather, these provisions show merely a broad and general interest in safe public transit, which is not sufficient to successfully invoke the public policy exception to vacate the arbitration awards as repugnant to an explicit, well-defined, and dominant public policy. There is no law or legal precedent specifically directing that a transit authority must control the schedules and work hours of transit employees to provide safe public transit, and the CTA cannot show a well-defined and dominant public policy that prevents collective bargaining of the type of scheduling and work hour matters at issue here. To the contrary, an explicit, well-defined, and dominant public policy supports the collective bargaining process between transit authorities and transit workers. This public policy favoring collective bargaining is ascertainable by provisions of the Transit Act and the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2012)) that expressly allow or require employers and employees to collectively bargain over matters directly affecting wages, hours, and terms and conditions of employment. 70 ILCS 3605/28a (West 2016); 5 ILCS 315/4 (West 2012).

¶ 21    Furthermore, our judicial decisions have recognized an " 'underlying public policy in favor of resolving collective bargaining disputes by arbitration.' " *Department of Central Management Services v. American Federation of State, County, and Municipal Employees (AFSCME), AFL-CIO*, 222 Ill. App. 3d 678, 686 (1991) (quoting *Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600, AFT,*

*AFL/CIO*, 74 Ill. 2d 412, 424 (1979) (*College Teachers Union Local 1600*)); see also *California Brewers Ass'n v. Bryant*, 444 U.S. 598, 608 (1980) (referring to "this Nation's longstanding labor policy of leaving to the chosen representatives of employers and employees the freedom through collective bargaining to establish conditions of employment").

¶ 22    The CTA cites *Carlson v. Chicago Transit Authority*, 2014 IL App (1st) 122463, and *ATU Local 241*, 399 Ill. App. 3d 689, to support its argument that the awards violated a well-defined public policy. The CTA's reliance on these cases, however, is unavailing. In *Carlson*, a bus passenger sustained injuries when the bus driver stopped suddenly to avoid a collision with a vehicle that cut into the traffic lane in front of the bus. This court addressed, in the context of a personal injury action, the duty of care a common carrier owes its passengers to exercise the highest degree of care consistent with the practical operations of its conveyances. *Carlson*, 2014 IL App (1st) 122463, ¶ 24. *Carlson*, which made no reference to collective bargaining or public employee labor law, simply referred to a general public policy favoring safe public mass transit.

¶ 23    In *ATU Local 241*, the CTA discharged a bus driver after the CTA discovered that he had been convicted of aggravated criminal sexual abuse of a minor who was a family member. *ATU Local 241*, 399 Ill. App. 3d at 690. The union filed a grievance on the driver's behalf, and an arbitrator ordered that the driver be reinstated. *Id.* at 695. The evidence at the arbitration hearing showed that the driver told his therapist he had engaged in sexual acts with the victim on countless occasions, failed to complete the sex offender treatment program, and failed several polygraphs concerning his sexual behavior before finally passing a polygraph several years after he left the treatment program. *Id.* at 690-95. In addition, the driver failed to advise the CTA that he was serving a four-year probation term and was a registered sex offender, and this court believed that he inevitably violated the terms of his probation during his employment with the

CTA by being alone with an unaccompanied minor. *Id.* at 699. On review, this court vacated the arbitration award because it violated well-defined and dominant public policies derived from specific statutes, including the criminal code, about protecting children from potential sexual predators on public transportation and protecting the public from convicted sex offenders. *Id.* at 697-98. Unlike the situation in *ATU Local 241*, there are no specific statutory provisions in the instant case to support the existence of a public policy favoring a public employer's unilateral control over matters of work conditions and hours to increase the safety of public mass transit. As discussed above, the CTA's references to the Illinois Constitution and the Transit Act show merely a general public policy favoring safe public transit. Furthermore, whereas the dispute in *ATU Local 241* concerned the reinstatement of a worker discharged by the CTA for misconduct, the instant case presents a dispute of an entirely different nature, *i.e.*, the CTA's unilateral implementation of rules that restrict the bargained-for rights of many workers. In addition, the work hour and schedule choice conduct at issue here does not remotely approach the heinous conduct at issue in *ATU Local 241*.

¶ 24 Even assuming the CTA met the first prong of the public policy exception to clearly show an explicit, well-defined, and dominant public policy favoring the implementation of rules limiting the work hours and schedule choices of transit workers to promote safe public transportation, the CTA must also satisfy the second prong of the exception—that the arbitration awards themselves, not the underlying actions leading to the grievances, violate such a policy. See *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 63 (2000); *AFSCME 1996*, 173 Ill. 2d at 308. Specifically, the CTA must show that the arbitration awards, by requiring the CTA to engage in collective bargaining and refrain from unilaterally imposing rules that directly affect the workers' rights concerning schedule choices

and work hours, run contrary to an explicit, well-defined, and dominant public policy favoring safe public transit.

¶ 25    The CTA asserts that there "can be no doubt" that the arbitration awards violated the public policy favoring safe public mass transit by the CTA because (1) common sense and the expert testimony presented by the CTA—about the safety standards adopted by public agencies in industries similar to mass transit—establish that the risk of employee fatigue will increase if the CTA is forced to reinstate the methods of operation that were in effect prior to the CTA's unilateral rule changes and (2) subjecting the CTA's unilateral rule changes to the collective bargaining process prevents the CTA "from taking effective and practicable action to fulfill its duty to provide safe public mass transportation." The CTA complains that its collective bargaining agreement is a "shackle that strangles [its] efforts to introduce effective safety measures" and "emasculate[s] out of existence" the CTA's management right "to operate its property according to its best judgment and the orders of competent authority."

¶ 26    The CTA's arguments lack merit. In rendering the awards, the arbitrators did not dispute that the CTA was attempting to improve the safety of its operation when it imposed the new restrictions on the workers' schedules and hours. The arbitrators simply interpreted the collective bargaining agreement to require the CTA to engage in the collective bargaining process and refrain from implementing the new restrictions unilaterally. As discussed above, the statutory provisions of the Transit Act and Illinois Public Labor Relations Act clearly show a well-defined public policy favoring collective bargaining for matters that directly affect wages, hours, and the terms and conditions of employment. We conclude that the arbitration awards requiring the parties to negotiate the proposed rule changes do not violate a public policy favoring safe public

transportation. Accordingly we deny the CTA's request to vacate the awards under the public policy exception.

¶ 27                        B. Whether the Dispute Involved a Nondelegable Power

¶ 28     In the alternative, the CTA argues that the arbitration awards should be vacated based on the legal principle of nondelegability of public authority, which provides that a dispute "is not arbitrable if it would constitute an impermissible delegation of discretionary public responsibility specifically reposed by law in" a public body such as the CTA. *College Teachers Union Local 1600*, 74 Ill. 2d at 420; see also *Parisi v. Jenkins*, 236 Ill. App. 3d 42, 52 (1992) (the police board's statutory power to determine cause for dismissal and terminate employees was an integral duty and function of the board and could not be abrogated by a collective bargaining agreement); *Board of Trustees of Junior College District No. 508 v. Cook County College Teachers Union, Local 1600*, 87 Ill. App. 3d 246, 250-51 (1980) (where the pertinent statute vested the school board with all powers proper for the maintenance, operation, and development of any college and the collective bargaining agreement reserved to the school board the duty to determine the qualifications and assignments of the faculty members, that duty, which required educational expertise, could not be delegated to an arbitrator and thus was not subject to arbitration).

¶ 29     The CTA contends that the arbitrators did not have jurisdiction to limit its nondelegable power to provide safe mass transit, this power includes the authority to limit the hours train operators can work, and the CTA could not bargain this duty away to the ATU regardless of any collective bargaining agreement. The CTA asserts that safety is integral to public mass transit

and this responsibility should not be turned over to or shared with arbitrators or labor unions because they have no expertise in safety matters.

¶ 30    The parties here do not challenge the arbitrators' interpretations of the collective bargaining agreement, which found that the workers had certain rights concerning their schedule choices and work hours that were directly affected by the CTA's unilaterally implemented rules. Consequently, we do not review contract interpretation issues as part of our review of the CTA's nondelegable duty claim. The question of whether a dispute is arbitrable is a question of law, which this court reviews *de novo. International Brotherhood of Electrical Workers, Local 193 v. City of Springfield*, 2011 IL App (4th) 100905, ¶ 14.

¶ 31    The CTA's references to provisions of the Illinois Constitution and Transit Act, which were discussed above, do not indicate that the law specifically reposed in the CTA the nondelegable power to regulate general transit safety or safety limitations of the workers' schedule options and work hours. To the contrary, the Illinois Public Labor Relations Act and the Transit Act expressly require the CTA to bargain over matters directly affecting hours and conditions of employment. 5 ILCS 315/4 (West 2012); 70 ILCS 3605/28a (West 2016).

¶ 32    We conclude that the CTA does not have a nondelegable duty that allows it to unilaterally determine, in the name of transit safety, restrictions on the employees' collectively bargained-for schedule options and work hours.

¶ 33                                    III. CONCLUSION

¶ 34    For the foregoing reasons, we find that the arbitration awards did not violate an explicit, well-defined, and dominant public policy or a nondelegable statutory power belonging to the

CTA. Therefore, we affirm the judgments of the circuit court, which rejected the CTA's public policy and nondelegable duty claims.

¶ 35    Circuit court judgments affirmed.

¶ 36    Arbitration awards affirmed.